Leslie M. DEAN, Plaintiff-Appellant,

v.

Russell N. YOUNG, Defendant-Appellant,

and

Sears, Roebuck & Company, a Corporation, Defendant-Respondent.

No. 51381.

Supreme Court of Missouri,

Division No. 1.

Nov. 8, 1965.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 13, 1965.

George E. Lee and Doris J. Banta, St. Louis, for appellant Leslie M. Dean; Carter, Bull, Baer, Presberg, Lee & Stanard, St. Louis, of counsel.

F. X. Cleary, Donald L. James, Daniel T. Rabbitt, Jr., Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant Russell N. Young.

John M. Goodwin, Henry S. Stolar, Hocker, Goodwin & MacGreevy, St. Louis, for respondent.

WELBORN, Commissioner.

Leslie M. Dean brought suit against Russell N. Young and Sears, Roebuck & Com-

pany for personal injuries sustained when a truck in which Dean was a passenger collided with an automobile driven by Young. Dean's petition attributed the collision to Young's negligence and alleged that Young was the servant of Sears, acting, at the time of the accident, within the scope of his employment. A jury returned a verdict in favor of plaintiff and against both defendants for $390,000.

The trial court overruled Young's motion for new trial and Young appealed from the judgment entered against him on the jury's verdict. The trial court sustained Sears' motion for judgment in accordance with its motion for directed verdict at the close of all the evidence. From this judgment in favor of Sears, Dean appealed.

The accident giving rise to the lawsuit occurred at about 6:30 A.M., September 17, 1960, on U. S. Highway 66 near its intersection with Missouri State Highway 28 and at a point about 4½ miles east of Fort Leonard Wood. Dean was a passenger in a Dodge pickup truck being driven west on Route 66 by John Butler. Route 66 is a divided 4-lane highway in the area and Butler was in the left or inner lane of the westbound roadway. Young was also driving west on Route 66 and overtook the Dodge pickup. Young passed the Dodge on the right and then, according to Butler and Dean, turned toward the left or inner lane in front of the Dodge. The left end of the rear bumper of Young's vehicle caught the right end of the Dodge front bumper. Butler was unable to control the Dodge and it overturned, producing serious injury to Dean which will be more fully discussed below.

The issue on the appeal of Dean from the judgment in favor of Sears is whether or not the trial court properly concluded, in response to Sears' after-verdict motion, that no submissible case was made against Sears on the question of a master-servant relationship between it and Young. Determination of that question will involve a somewhat detailed consideration of the facts bearing upon the issue.

Young was a native of the Lebanon, Missouri vicinity. He had moved to St. Louis and in 1956 he was employed by Dependable Appliance Service, Inc. as a service technician repairing washing machines and dryers. In January, 1960, Young was laid off of his job in St. Louis and he went to Lebanon to visit his parents.

Sears had a catalog store in Lebanon and Young went to the store and asked the manager, Mr. Walters, about doing service work. Sears sold various appliances which required service from time to time, some under warranties made when the devices were sold by Sears. Customers requested service through the Sears store at Lebanon. That store did not have a regularly employed serviceman. For some work, Sears' employees in Rolla and Springfield were called in. For other work, various servicemen in Lebanon were used to service particular appliances, such as television receivers, washers and dryers and refrigerators.

Walters knew Young and knew that he was experienced in repairing Sears' washers and dryers. Walters told Young that he was looking for a serviceman and an informal, oral understanding was arrived at whereby Young would, when in the Lebanon vicinity, handle service requests made through the Sears store.

Sears furnished Young no tools. He was not provided an office or shop in the Sears store. He used his own auto to call on the customers and performed his work in the customer's house or wherever the appliance was located. Whenever request for service was received at the Sears store, the employee receiving the request would, on a Sears' "Service Order" form, record the name of the customer, his address and the service requested. The order was checked in an appropriate box to show whether the work was to be charged to the customer, or, in case a warranty was in effect on the appliance, to the store.

Young would go to the store when he was in Lebanon and pick up the service orders which had accumulated since his last stop at the store. He would then go to the customer's address and perform the necessary service work. During 1960, Young worked on 255 separate service orders through Sears' Lebanon store. The work was done on 53 separate dates, 36 of which were Saturdays, 6 Fridays and the remainder on the other days of the week.

At the time of the accident, Young had resumed work with Dependable Appliance Service, Inc., in St. Louis. He left St. Louis before daylight on Saturday, September 17, 1960, driving his own Chevrolet station wagon which he used in the Sears' service work. While in St. Louis, Young had received a postcard from Dan Helton of Palace, Missouri, asking Young to stop to service appliances. Young had previously worked on an appliance of Helton's. Palace is south of Fort Leonard Wood and Young intended to go there on the morning of the accident before going on to the Lebanon store. Following the accident and before going to Lebanon, Young did go to Helton's and worked on two appliances, one of which was in warranty and for which Young's labor was charged to Sears. Young himself prepared the service orders for these jobs on blank forms which Sears had furnished him.

Young also had in his possession at the time a service order dated September 9, requesting service for Doyle Murrell at Falcon, Missouri. Young intended to make this call also before going to Lebanon. He did call on Murrell and did the necessary work, although he was not sure whether he did so before going to Lebanon. In any event, Young went to Lebanon, where he picked up seven other service orders which he filled on September 17.

We have accepted the criteria set out in the Restatement of Agency for determining whether or not a questioned relationship is that of master and servant or employer and independent contractor. See

Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S.W.2d 58, 61 [3–5]. We will consider how the evidence here bears upon each of the criteria specified in the Restatement of Agency, 2d, § 220, p. 485.

According to the Restatement:

■ "(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

■ "(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work; * * *."

This element, control or right to control, is the one most frequently referred to in our cases distinguishing a servant from an independent contractor. Gardner v. Simmons, Mo.Sup., 370 S.W.2d 359, 362 [5]; Talley v. Bowen Const. Co., Mo.Sup., 340 S.W.2d 701; Frank v. Sinclair Refining Co., 363 Mo. 1054, 256 S.W.2d 793, 797 [5]; Benham v. McCoy, Mo.Sup., 213 S.W. 2d 914, 919 [7–11]. By the Restatement's definitions, this is the element primarily which distinguishes a servant and an independent contractor. 1 Restatement of Agency, 2d, § 2, p. 12.

■ In this case, the evidence of the issue of control or right to control demonstrated rather clearly the absence of this element. The evidence showed that Young came and went as he saw fit. According to Walters: "He didn't come in on no certain days, not every day. When he was off, nothing else to do, he would come by. I never did know when he was coming or not coming." Walters did not direct on which service orders Young should work. The orders were placed on a spindle. Young looked them over and took those

which he chose. Plaintiff states that the evidence shows that Walters sometimes told Young which customers to attend to first. We, however, fail to find evidence which warrants such conclusion. Walters apparently did inform Young on occasions that a customer was particularly upset, "one that was really kicking, then he would have to do what he considered was best about it." The fact that Young was told to do what *"he"* considered best about it" is more indication of lack of control than the contrary.

As will be discussed more fully below, Young subsequent to the accident did become, for a time, a full-time, regular employee of Sears' Lebanon store. Walters succinctly described the difference between Young's status then and his status at the time of the accident, by saying: "He done what I told him to do after I hired him. He done what he wanted to do before I hired him."

■ Plaintiff points out that Young was required to do certain paper work for Sears in the manner dictated by Sears. The reference is to Young's filling in on the service order form supplied by Sears information concerning the work done on a particular order, the time spent and the charge made for his work. On warranty jobs, this information was necessary in order for Young to obtain his compensation from Sears. The fact that Sears required such information to be submitted on a form provided by it does not indicate any significant exercise of control of the manner of Young's performing the service. See Williamson v. Southwestern Bell Tel. Co., Mo.Sup., 265 S.W.2d 354, 358–359 [3–5].

"(b) (W)hether or not the one employed is engaged in a distinct occupation or business; * * *."

Young was engaged in a distinct occupation of a repairman. His business as such was distinct from that of Sears at the period in question. Young bore the expense of the business. He alone received any profit thereupon.

■ Plaintiff argues that Young did not hold himself out to the public as an appliance repairman; that he was employed as a servant by Dependable and that, therefore, he was not engaged in an independent calling. Although the work of a repairman is not necessarily an independent calling, it obviously may be. It is a matter of common knowledge that many persons do engage in service work as an independent calling or occupation. The fact that Young was engaged in such work for Dependable as a servant (if he was) would not require the conclusion that he was engaged for others in the same relation, or even that he would likely be so engaged.

"(c) (T)he kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; * * *."

In this case, the evidence showed no clear pattern in the Lebanon area. Sears did sometimes use regularly employed servicemen from other localities. Young himself was eventually employed at the Lebanon store in what was likely the status of a servant. On the other hand, at the time of the original arrangement between Young and Sears, the work was being done in part by independent specialists. Walters testified that he wanted to employ a refrigerator repairman who did occasional work for Sears, but couldn't do so because the man wanted to operate his own shop.

"(d) (T)he skill required in the particular occupation; * * *."

Undoubtedly, the work did require a significant degree of skill and training. Walters was aware of Young's experience in working on Sears' appliances when the arrangements were made originally.

"(e) (W)hether the employer or the workman supplies the instrumentalities,

tools, and the place of work for the person doing the work; * * *."

Young used his own tools and his own automobile. Sears did not provide a place for his work.

Sears did furnish some of the parts needed for repair work. However, as to work not under warranty, Young was charged the regular Sears' retail price and he was free to charge the customer whatever he chose.

Plaintiff points out that Sears furnished Young "Service Order" forms, he having had blank forms in his possession which he filled in upon his call to Helton on the morning of the accident. We perceive no greater significance in such fact than in the fact that Young was required to complete the service order forms given him and return them to Sears. Primarily, the entire matter related to his compensation by Sears.

"(f) (T)he length of time for which the person is employed; * * *."

Young was not employed for any definite time. He had no definite hours of employment. He worked irregularly when he was in Lebanon, if work was available, and if he wanted to do it.

Plaintiff points out that Young had no contract for a fixed period, but could terminate his work at any time and Sears could terminate his services at any time. An employer-independent contractor relationship need not be for a fixed time and may be terminable at the will of either party. Nor would the absence of a formal contract in writing be of particular significance. Many employer-independent contractor relationships do arise from formal written agreements, such as when a contractor is engaged to build a building. However, the relationship need not be based upon formal written contract.

"(g) (T)he method of payment, whether by the time or by the job; * * *."

Although Young's compensation, at least as to work under warranty, depended in part upon the time spent, he was basically compensated by the job. He received $4.00 for the first 30 minutes on any call or any time less than 30 minutes. Thereafter, he received $1.00 for each 15 minutes spent on the call. According to Walters, he didn't tell Young what to charge for his labor on the work out of warranty which was paid for by the customer. Young testified that he charged customers who paid him at the same rate he received for warranty work. When asked whether this rate was suggested by Walters, Young replied, "No, I don't think so." Sears did not bill customers for Young's work out of warranty, although on occasions the customer would leave the money at the store and it would be paid Young when he came in. If the customer did not pay, Young received no compensation.

Plaintiff says Young was paid not by the job, but by the hour. Young was not paid by the hour according to our understanding of such an employment arrangement. He did receive $4.00 if the service call required 30 minutes or less and $1.00 for each additional 15 minutes of the call. However, as shown by service orders in evidence, he received the $4.00 if the call required only 10 minutes, 20 minutes or 30 minutes. On an hourly basis his rate of pay on the 10-minute call was $24.00 per hour, the 20-minute $12.00 per hour, the 30-minute $8.00 per hour and he actually received $6.00 for one-hour calls.

"(h) (W)hether or not the work is a part of the regular business of the employer; * * *."

Sears undoubtedly was in the business of supplying service for purchasers of its appliances. The evidence showed that at times full-time employees of Sears performed such work, while at other times the work was delegated to whoever was available to do the work.

Plaintiff says the appliance work was not occasional or sporadic, but was a regu-

lar part of the business of the Lebanon store where an average of two calls per day was received. Again, that is merely another factor for consideration. Here we have clear evidence that Sears employed two strikingly different approaches to meeting the demand. The different approaches could unquestionably involve different legal relationships and consequences.

"(i) (W)hether or not the parties believe they are creating the relation of master and servant; * * *."

Plaintiff points to various factors which might have evidenced that such was the belief of the parties to the January, 1960 arrangement between Walters and Young. Walters had the authority to employ servants. He did employ Young on some basis to do appliance repairs for the store. Walters spoke of "hiring" Young, a term which, according to plaintiff, "generally characterizes the master-servant relationship." Plaintiff would also deduce that Young considered himself to be working for Sears from his inquiries to Walters: "Got anything I can do for you to-day?"

However, the highly tenuous conclusion which plaintiff would draw from these facts fairly well is nullified in this case by the evidence of the changed character of the relationship between Young and Sears, when, in April, 1961, Young did become a full-time Sears employee. At that time, Young submitted an employment application to Sears. He was given intelligence and arithmetic tests by Sears and underwent a physical examination. Sears began to withhold income tax and social security taxes from his pay. Previously, payments to Young by Sears had been reported on Internal Revenue Form 1099, without deduction for income tax withholding or social security taxes. All charges for Young's work were paid to Sears and Young was compensated at the rate of $2.12 per hour for an 8-hour day, 5-day week. A shop was provided Young in the Lebanon store and tools and equipment were provided for him by Sears. He wore uniforms provided by Sears, bearing the Sears emblem. He was required to fill out a route sheet, indicating his calls, itinerary and time.

All of these elements, present upon the existence of what was a master-servant relationship and absent upon the original arrangement, demonstrate to us that the parties must have considered the original arrangement something other than that of master and servant.

In our opinion, viewing all of the evidence most favorably to plaintiff, the inference is clear that there was no master-servant relation between Young and Sears at the time of the accident. The inference being clear, resolution of the question was properly a matter for the court.

Plaintiff urges that a contrary inference was permissible under the evidence and that the question was, therefore, properly one for the jury. However, to support the inference which he would draw, plaintiff relies upon bits and shreds of evidence, such as that Young worked as a servant for Dependable and was therefore accustomed to work as a servant; that he was required to fill in the service order form in the manner prescribed by Sears; that Sears had provided him the two service order forms filled out when he did the work for Helton; that Sears provided parts for which he did not pay Sears unless the customer paid Young for them; that Young was paid for his labor by the hour; that the relationship between Sears and Young was terminable at will by either party; that Young had no right to substitute another to do the work (the record is silent as to this insofar as we find and plaintiff refers to no place in the transcript where such evidence is to be found); that there was no written contract between Young and Sears, and that the work which Young did was a part of Sears' regular business.

If the evidence relied upon by plaintiff stood alone, it might justify sub-

mission of the issue of the existence of a master-servant relationship to the jury. See Mattocks v. Emerson Drug Co., Mo. App., 33 S.W.2d 142. However, although we consider the evidence in the light most favorable to plaintiff, we are not limited to the consideration of only the evidence favorable to plaintiff when, as here, all of the evidence fully describing the relationship has been presented by the plaintiff and is essentially uncontradicted. Practically all of the evidence bearing upon the issue of the relationship between Young and Sears was oral testimony. The defendants offered no testimony. Based upon the cross-examination of some of plaintiff's witnesses, written exhibits were introduced in evidence by defendants. Plaintiff called Young as a witness in its behalf. Plaintiff also introduced the deposition of Walters, the manager of the Sears store at Lebanon. (At the time of the deposition, Walters was no longer employed by Sears.) We find no basic contradictions in the testimony pertaining to the relationship between Young and Sears. In these circumstances we consider all of the evidence, viewing it in a light most favorable to plaintiff, Talley v. Bowen Const. Co., Mo.Sup., 340 S.W.2d 701, 705–706 [7, 8], Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726, 727–728 [1, 2], although plaintiff is not bound by the testimony of the defendant elicited on his cross-examination, Baum v. Abel, Mo.App., 379 S.W.2d 164, 165. The function of the court is to determine whether from the evidence, so considered, more than one inference as to the status of the parties is reasonably to be drawn. In that event, the inference to be drawn is for the jury. However, where only one inference is permissible, the question is for the court.

Plaintiff asserts that there were contradictions and inconsistencies in the evidence which would preclude the court's determination of the relation on the basis of undisputed evidence. He points to a statement by Young in his testimony: "They told you what they wanted you to do and what they didn't want you to do."

However, the statement was made in connection with interrogation of plaintiff as to why he did not check one of the eight numbers under the "Free Service Reason Code" on the service order. No basis for the assumption that the statement was intended to refer generally to direction by Sears appears.

Plaintiff would also find contradiction to Walters' testimony that he never knew when Young was coming or going in the fact that one witness, Montgomery, at whose residence Young made a service call on the date of the accident had called Sears the day before and was told that a service call would be made the next day. Plaintiff also notes that Young had in his possession a service order which apparently had been picked up by Young on an earlier visit to the store. Plaintiff would deduce from these facts the conclusion that Walters obviously expected Young to return, otherwise he would not have been entrusted with the completed service order, and that Young's return on September 17 was contemplated since a promise of service was made to a caller the previous day. However, Montgomery did not testify that he was told that Young would call on him the next day. The evidence showed that the Lebanon store called upon various sources of repair service, including Sears' employees in Rolla and Springfield. A promise that a call would be answered the next day would not necessarily mean that a particular serviceman would make the call. As for the Murrell order which Young had in his possession at the time of the accident, it shows the date taken as "9/9." Young worked in Lebanon on September 10, 1960. The reasonable inference is that he had picked up the service order at that time, but had not gotten around to it before he decided to stop working on that date. The fact that he had it on the 17th is no evidence that his return on that date had been anticipated by Sears.

 We shall not discuss at length the authorities cited by plaintiff. We have

examined them carefully. We find none of the cases cited factually similar to this. They generally confirm the oft-repeated statement that each case of this nature must be decided upon its own facts. See Gardner v. Simmons, Mo.Sup., 370 S.W.2d 359, 361. As the cases cited by plaintiff hold, once a prima facie case of agency is made, the burden of producing evidence of an independent contractor relationship devolves upon the defendant. Andres v. Cox, 223 Mo.App. 1139, 23 S.W.2d 1066, 1069; Ward v. Scott Milling Co., Mo.App., 47 S.W.2d 250, 253. Likewise, plaintiff is not obliged to disprove the independent contractor relationship, but only to establish the agency (master-servant) relationship. Gardner v. Simmons, supra; Mattocks v. Emerson Drug Co., Mo.App., 33 S.W.2d 142, 144. Again, as plaintiff states, the general rule is that once plaintiff has made a prima facie case of agency, the issue must be submitted to the jury. E. R. Darlington Lumber Co. v. Missouri Pacific R. Co., 243 Mo. 224, 147 S.W. 1052, 1058. However, that rule is not applicable when, as here, the unfavorable, undisputed evidence which plaintiff himself produced effectively destroys the prima facie case based upon only a portion of the evidence. Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 101 [1, 2], 57 A.L.R. 615. In that case the court pointed out that the rule relied upon by plaintiff has exceptions, "When the proof is documentary, or the defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true), and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury." 1 S.W.2d 101.

In our opinion, the reasonable inferences from plaintiff's evidence, considered as a whole, all point to the existence of an employer-independent contractor relation between Sears and Young. The trial court, therefore, properly sustained Sears' motion for judgment.

Turning to the appeal of defendant Young, his first contention is that the trial court, by submitting the case against Sears and him together, denied him a fair trial "because the jury was thereby improperly permitted to deliberate questions of liability and damages against a corporation of great and well-known financial strength * * *."

According to Young, and the record so shows, the trial court expressed, prior to the submission, "great reluctance" to submit the case against Sears and further announced at that time that he would "take away" any verdict against Sears. Young argues that submission of the case against both defendants in such circumstances was prejudicial to him both as to the issue of liability, and as to the issue of damages. "If the case had not been submitted against defendant Sears, the jury may well have returned a verdict in favor of this defendant. But, even if the jury found against him, obviously, the amount of the verdict would have been considerably less."

■ Young's counsel candidly acknowledges that the proposition which he submits is a novel one. He acknowledges the general rule that one defendant cannot complain about error committed against a co-defendant. McCamley v. Union Electric Lt. & Pwr. Co., Mo.App., 85 S.W.2d 200. However, Young would apply an exception to such rule, similar to that applied in Nevins v. Solomon, 235 Mo.App. 967, 139 S.W.2d 1109, certiorari quashed, State ex rel. Nevins v. Hughes, 347 Mo. 968, 149 S.W.2d 836, and Biggs v. Crosswhite, 240 Mo. App. 1171, 225 S.W.2d 514, that the error must not be prejudicial to the rights of the other defendant. In those cases, the prejudice consisted of the granting of a directed verdict as to one defendant and then submitting the case as to the other on a defense that the negligence of the exonerated defendant was the sole cause of the accident.

■ Here, other than the bald statement that a submission against Young alone might have produced a verdict in his favor because Sears is a corporation, Young does

not demonstrate in what manner the submission of the case against both defendants affected him as to his liability or defenses. The only defense submitted on behalf of Young was that the accident was caused by Butler's negligence in permitting the front end of the Dodge to come into the right-hand lane without warning, causing the collision. The jury obviously found against this defense and the evidence in support of plaintiff's theory as to the cause of the accident and defendant's negligence in connection therewith is not questioned. The net effect of Young's argument is that the psychological effect upon the jury of the submission of the case against both defendants was such that the matter of liability was determined on the sole basis that Sears was a corporate defendant, without regard for the basic question of Young's negligence. We are unwilling to accept such assumption which would, carried to its ultimate application, invalidate any verdict against a wealthy corporate defendant.

■ As for the question of damages, Young argues that the situation is analogous to that found in Thomas v. Durham Motors, Inc., Mo.App., 389 S.W.2d 412, and Dawes v. Starrett, 336 Mo. 897, 82 S.W.2d 43, where it was held that when two or more defendants are sued jointly, their wealth either individually or collectively cannot be shown for the purpose of punitive damages, for one defendant cannot be punished for the wealth of another. However, that rule does not prohibit actions for punitive damages against joint defendants by reason of the fact that one defendant is without property and that the other is possessed of considerable means. 25 C.J.S. Damages § 126, p. 743. In any event, we are not here dealing with punitive damages, but with compensatory damages which necessarily depend upon and must have their basis in the damage sustained by plaintiff.

■ Since Young next contends that he should have been awarded a new trial because the verdict was so grossly excessive as to show that it was motivated by sympathy, passion, bias and prejudice, we consider next the nature and extent of plaintiff's injuries and his damages resulting therefrom. As Young states, the $390,000 verdict is in excess of any personal injury judgment sustained by this court. That fact alone, however, does not require that Young's contentions be upheld.

As a result of the collision, the Dodge pickup in which Dean was riding overturned and he was pinned upside down between the seat and the top of the truck. He was aware immediately after the accident of a lack of sensation in his lower body and that he could move only one hand and thumb. He was removed to the Pulaski County General Hospital at Waynesville, where X-rays revealed a compression fracture with dislocation of the 5th cervical vertebra, which impinged into the spinal canal 1/4 inch and damaged the spinal cord. He was transferred by airplane to St. John's Hospital in Springfield, Missouri, on September 18, 1960. Upon admission there, Crutchfield tong traction with 15-pound weight was applied to his skull and he was placed in a Foster frame. On September 19, 1960, Dr. McAlhany, a neurological surgeon, examined plaintiff and reported the following observation: "He was awake, he was alert, he was oriented; he was coherent in talking. He couldn't move his legs. He had very limited movement of his arms. He couldn't extend either arm; he couldn't extend his fingers. He could very weakly close his fingers. He could very weakly bring his arm to his (sic), but he couldn't push down. He was having a slight amount of difficulty with his breathing, with his respiration, and his respirations were what we call 'diaphragmatic.' He was breathing purely with his diaphragm. His chest muscles were paralyzed. He was breathing only with his diaphragm." On September 20, 1960, the doctor performed a cervical laminectomy which confirmed the X-ray diagnosis of fracture of the 5th cervical vertebra with damage to the spinal cord.

During his stay at St. John's, lasting until November 26, 1960, plaintiff was under constant nursing care. The Crutchfield tong traction was kept in place for six weeks, at which time it was removed and a Thomas collar placed on him and physical therapy treatment was undertaken. Plaintiff was unable to move himself and nursing care was required to turn him in the Foster frame. Plaintiff's bladder control was paralyzed, requiring the insertion of a catheter. Lack of bowel control required periodic enemas.

For several weeks after his admission, plaintiff had considerable pain in his neck and arm which required morphine originally and other pain-killing medication throughout his hospital stay.

According to Dr. McAlhany, plaintiff's neurological condition was essentially unchanged upon his discharge from St. John's. He was flown from Springfield to Hines, Illinois, on November 26, 1960, where he was admitted to the Veteran's Administration Hospital. Neurological findings there were essentially the same as those previously made. He was discharged from Hines on June 16, 1961. At that time, he was wearing a right-hand metacarpal phalangeal flexor, with which he was able to perform certain functions such as feeding himself, holding a pencil, using the telephone, shaving himself and holding a cigarette. At the time of his discharge he had only slight function in his left wrist, but there was no significant neurological recovery in the remainder of his trunk and lower extremities.

Upon his discharge from Hines, plaintiff returned to his home in Michigan, where he was cared for by his wife, daughter and son until the date of the trial. He slept in a regular bed at home, but had to be assisted in getting in and out of bed and in turning over. A hoisting device was employed to take him to the bathroom. His bowel function had resumed with the assistance of medication, but urine disposal was through a catheter which his wife changed twice a week.

Dr. McAlhany examined plaintiff on the morning of the trial and reported that he "found essentially no basic change in his neurological examination. There has been, since November, 1960, a slight improvement in the strength of each biceps muscle, which he pulls up, but he remains obviously weak in these muscles. There has been a definite improvement in the shoulders. He can abduct his shoulders with much more strength. His fingers and arms remain severely weakened and compromised. He cannot extend the fingers of either hand. He can flex the fingers very weakly. The small muscles on each hand which supply and control finger movements have undergone severe shrinkage and wasting since he was examined last [11/26/60] by me."

According to Dr. McAlhany, the plaintiff's neurological condition is "without question" permanent.

Reasonable and necessary expenses for hospitalization and treatment to the date of trial amounted to $10,392.00. Current medical outlays were running at the rate of approximately $1,000 per year at the time of trial.

Plaintiff was 33 years of age at the time of the accident. He had finished the second year of high school and worked at various construction jobs in Michigan. In 1960, he came to Fort Leonard Wood as an employee of Engineered Concrete Construction Company. His compensation from that company in 1959 was $7,783. After coming to Fort Leonard Wood, he began his own business, Les Dean Enterprises. That company was engaged as a subcontractor on housing work at Fort Leonard Wood at the time of the accident. The company had 60 employees and at the time of the accident had completed a substantial portion of a $240,000 subcontract. The project super-

intendent sought to hire Dean to work for the principal contractor on the job and offered Dean $1,000 per month, but Dean preferred to work with his own company. Dean was drawing $150 per week from his company. As a result of the accident, Dean's company was forced to go out of business.

After his discharge from Hines Veteran's Administration Hospital, Dean opened a garden supply business and spent about 8 hours a day working there, with the assistance of members of his family. However, the project was not profitable and Dean gave it up. At the time of trial, he had gone into the used car business, working at a desk 7 or 8 hours a day and answering the telephone. At the time of trial, the business had not shown a profit.

Dean was a normal, healthy, athletic individual before his injury. According to Dr. McAlhany, a person who suffers a spinal injury such as Dean and who lives to normal life expectancy is exceptional, as the majority of persons who suffer such injuries do not survive for the period of normal expectancy. However, according to Dr. McAlhany, Dean "looks very well today" and it is "purely speculative as to what is going to take place in the future with the man." A normal 37-year-old man, Dean's age at the time of trial, has an average life expectancy of 33.4 years and an average work expectancy of 26.8 years.

We reject Young's contention that the verdict is so grossly excessive as to indicate that the verdict of the jury was motivated by sympathy, passion, bias and prejudice. His argument in support of this conclusion is based almost exclusively on the fact that the verdict is grossly in excess of any other personal injury verdict rendered in Missouri. Whether or not it is, we do not judicially know. However, that fact alone would not show that the verdict was the result of sympathy, passion, bias and prejudice. In his argument, Young in no manner attempts to relate the size of the verdict to the elements of damage shown by the uncontradicted evidence of plaintiff. If Young is to succeed in this contention, the burden is upon him to demonstrate that the amount of the verdict returned by the jury was "glaringly unauthorized by any evidence." Bente v. Finley, Mo.App., 83 S.W.2d 155, 161. This he has not even attempted to do and it is not our duty to analyze the evidence from this standpoint.

In support of his final contention that the verdict is excessive and should be reduced by remittitur, Young relies primarily upon the rule of reasonable uniformity. Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157. Young argues that Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14, and Coffman v. St. Louis-San Francisco Ry. Co., Mo.Sup., 378 S.W.2d 583, are the cases which have been considered by the Supreme Court in which the circumstances most closely approach those of the present case and that, in the interest of uniformity, the verdict here should be reduced to the vicinity of that approved in those cases. In Moore, a $150,000 judgment, reduced to that amount by remittitur of $50,000 by the trial court, was affirmed. In Coffman, a $50,000 remittitur was order by Division No. Two from a $270,000 verdict.

Both Moore and Coffman involve similarities to and differences from the present case. The ages of plaintiff (37 at time of trial) and Moore (34 at time of trial) are more nearly comparable than those of plaintiff and Coffman (17 years of age at time of trial). The injuries suffered by plaintiff are more nearly comparable to those sustained by Coffman. Coffman's spinal cord was severed and he was paralyzed from the level of and below C–7. Moore sustained multiple fractures of the lower extremities, required amputation of

the right leg at the knee and a total of 21 operations. However, as pointed out in Coffman, "such residue of body and extremities that ' * * * [Moore has] left' are sensory, and capable of utilization *from the brain*; * * *." 378 S.W.2d 1. c. 601. Moore was a police sergeant earning $381 per month. Dean had demonstrated earnings of almost $7,800 in 1959, was drawing $150 per week from his own company at the time of his injury and declined an offer of employment at a compensation of $1,000 per month, preferring to remain with his own company. Coffman had no demonstrated earning capacity, but the excessiveness of the verdict was considered in the light of potential future earnings, estimated, on the basis of his intention to go to college, at $6,000 per year. Moore's medical expenses and lost earnings at the time of trial amounted to some $32,400. On the basis of Dean's demonstrated earnings, his medical expenses and lost earnings amounted to approximately $44,000. Coffman being a minor, those items were not factors in the damages in his case. All three (Dean, Moore and Coffman) will require nursing service for the rest of their lives. As with Moore, Dean is now receiving the benefit of the services of his wife and children in lieu of professional nursing care. However, as in Moore, the jury would be entitled to take into consideration the probability that such family care will not always be available.

Viewing plaintiff's demonstrated superior earning capacity and the fact that in Moore a $150,000 judgment was found not excessive, so that there was no determination of what judgment might have been sustained on the basis of the evidence in Moore, we are convinced that the rule of uniformity does not require that the judgment here be limited to the amount affirmed in Moore.

Coffman, being younger than plaintiff here, his normal life expectancy upon reaching his majority was 48.3 years, compared with Dean's 33 years at the date of trial. Coffman, however, had no demonstrated earning ability, although, as above mentioned, an estimated figure of $6,000 per year was used in consideration of the question of the excessiveness of the verdict. Dean, on the other hand, did have demonstrated earning capacity and, in view of the offer of a job at $1,000 per month which he declined, the jury might reasonably have found that his potential earning capacity considerably exceeded the $7,800 per year which he was drawing from his company. Special damages here of more than $44,000 were not involved in the Coffman judgment, ultimately affirmed for $220,000.

Considering plaintiff's evidence here in its entirety and viewing the matter in the light of our uniformity rule, we consider that the verdict for plaintiff was excessive by $140,000. If plaintiff will remit the sum of $140,000 within fifteen days from the date of the filing of this opinion, the judgment will be affirmed as of the date of its rendition for $250,000; otherwise, the judgment will be reversed as to defendant Young and the cause remanded for a new trial as to him. The judgment of the trial court as to defendant Sears, Roebuck & Company is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.