The GERRY ELSON AGENCY, INC.,
Respondent,

v.

James B. and Lulu MUCK, Defendants,
and

Kissick Truck Lines, Inc., Garnishee-
Appellant.

No. KCD 26400.

Missouri Court of Appeals,
Kansas City District.

May 6, 1974.

William R. Fish, Douglas H. Delsemme, Lowell L. Knipmeyer, Knipmeyer, McCann, Fish & Smith, Kansas City, for garnishee-appellant.

Richard N. Brown, Brown & Casey, Brookfield, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

This is an appeal from a judgment against garnishee-appellant entered in a court-tried case. The facts are relatively simple and are not in substantial dispute.

On November 17, 1970, the respondent obtained a judgment in the Magistrate Court against James B. and Lulu Muck in the amount of $1482.71.

This judgment was filed in the Circuit Court of Linn County, Missouri and a general execution was issued. In aid of such execution a summons in garnishment was directed to Kissick Truck Lines, as garnishee, and served upon it in Jackson County, Missouri. The issues below were made upon the judgment creditors' denial of the garnishee's answers to interrogatories and the garnishee's reply to such denial.

Thus drawn, the basic issues presented may be simply stated. At the time of the service of the garnishment, Kissick owed the judgment debtor, James B. Muck, the sum of $1116.16 under the terms of a "Lease and Operating Agreement" between Muck and Kissick. In response to the garnishment, Kissick voluntarily paid into the registry of the court the sum of $279.04, which was 25% of the amount of its indebtedness to Muck under this agreement. Its position is that the amount it owed Muck was "earnings" for "personal services" furnished by Muck and that under the Consumer Credit Protection Act, Sub-chapter II, Restrictions on Garnishment, 15 U. . S.C., § 1671 et seq., only 25% of the $1116.16 was subject to the garnishment. On the other hand, the respondent judgment-creditor asserts that such federal statute does not apply because the money due Muck was not derived from "earnings" for "personal services" but was derived from "equipment rentals" under the contract above referred to and, therefore, the whole sum of $1116.16 was subject to execution and garnishment.

This issue was decided in favor of the respondent in the trial below and judgment entered against the garnishee for the full sum of $1116.16, although Kissick had theretofore voluntarily paid to Muck, after the service of garnishment upon it, 75% of the amount involved. From this adverse result, garnishee appeals.

■ The parties did not request of the trial court any findings of fact or conclusions of law and it made none. We must assume on this appeal therefore, that all issues of fact were "found in accordance with the result reached", Rule 73.01(b), V. A.M.R. That is to say, the trial court found that the money due from Kissick to Muck did *not* represent "earnings" for "personal services" and therefore did not enjoy any exemption from garnishment under the federal statute. Our review is upon both the law and the evidence as in suits of an equitable nature, and the judgment of the trial court will not be set aside unless clearly erroneous. Rule 73.01(d); Wykle v. Colombo, 457 S.W.2d 695, 699 (Mo.1970); Mission Ins. Co. v. Ward, 487 S.W.2d 449, 451 (Mo. banc 1972).

In determining whether the judgment of the trial court is proper, on the one hand, or clearly erroneous, on the other hand, we must, to a large degree, plow virgin ground. Neither able counsels' briefs nor our independent research has revealed any decision of state or federal courts which marks any clear road of precedential value involving the garnishment exemption of the federal act.

■ Of this we can be sure, we are dealing with an *exemption* statute which has preempted the field over state laws so far as applicable to certain types of garnishment proceedings. Hodgson v. Cleveland Municipal Court, 326 F.Supp. 419 (N. D.Ohio, 1971).

Before looking at the actual terms of the federal garnishment law applicable to the case before us, the intent of Congress in the enactment of that law is clearly recorded and may be found in 1968 U.S.Code

Cong. and Admin.News, p. 1962 et seq. At page 1963, it is stated:

> "Title II restricts the garnishment of *wages,* which the committee finds to be a frequent element in the predatory extension of credit, resulting, in turn, in a *disruption of employment,* production, and consumption." (Emphasis added)

and

> "Title II of your committee's bill, restricting the garnishment of *wages,* will relieve many consumers from the greatest single pressure, forcing *wage earners* into bankruptcies." (Emphasis added)

Likewise, at page 1979, it is stated:

> "The limitations on garnishments of *wages* adopted by your committee, * * * will relieve countless honest debtors driven by economic desperation from plunging into bankruptcy in order to preserve *their employment* and *insure a continued°means of support for themselves and their families."* (Emphasis added)

This same service at page 1966 quotes from the President's message to Congress on poverty, which message may well have been the genesis for the statute here considered:

> "Hundreds of *workers* among the poor lose their jobs or *most of their wages* each year as a result of garnishment proceedings. * * * (Emphasis added)
>
> *I am directing the Attorney General * * * to recommend the steps that should be taken to protect hard-earned wages and the jobs of those who need the income most."* (Emphasis not the Court's)

When the statute was enacted on May 29, 1968 (to take effect on July 1, 1970), it contained the following:

> "Section 1671. Congressional findings and declaration of purpose.
>
> (a) The Congress finds:

> (1) The unrestricted garnishment of *compensation due for personal services* encourages the making of predatory extensions of credit. Such extensions of credit divert money into excessive credit payments and thereby hinder the production and flow of goods in interstate commerce.

> (2) The application of garnishment as a creditor's remedy frequently results in *loss of employment* by the debtor, and the resulting *disruption of employment,* production, and consumption constitutes a substantial burden on interstate commerce.

> (3) *The great disparities among the laws of the several States relating to garnishment* have, in effect, destroyed the uniformity of the bankruptcy laws and frustrated the purpose thereof in many areas of the country.

> (b) On the basis of the findings stated in subsection(a) of this section, the Congress determines that the provisions of this subchapter are necessary and proper for the purpose of carrying into execution the powers of the Congress to regulate commerce and to establish uniform bankruptcy laws." (Emphasis added)

██. It is manifestly clear that the intent of Congress in the enactment of this subchapter of the Consumer Credit Protection Act was to grant an exemption to *wage earners* from *burdensome garnishments,* to protect *employment* of *wage earners,* and to prevent bankruptcies. It was to grant relief for the wage earner debtors and "more particularly for his family", against economically destructive garnishments. Murray v. Zuke, 408 F.2d 483 (8th Cir., 1969); In re Kokoszka, 479 F.2d 990, 996–997 (2d Cir., 1973). Its provisions are remedial in nature and should

be liberally construed. In re Cedor, 337 F.Supp. 1103 (N.D.Cal., 1972).

In implementing this purpose, the Congress was faced with "the great disparities among the laws of the several States relating to garnishments"[1] as noted in Section 1671 of the Act as above quoted and used the term "earnings" as description of the subject matter of the garnishment to which the exemption was applicable. It did so, however, without diminishing in any degree the basic and avowed purpose of the law. Section 1672, 15 U.S.C., is in the following terms:

"Section 1672. Definitions.
For the purposes of this subchapter:

(a) The term *'earnings' means compensation* paid or payable for *personal services,* whether denominated as wages, salary, commission, bonus, or otherwise,
* * *

(b) The term *'disposable earnings'* means that part of the earnings of any individual remaining *after the deduction* from those earnings of any amounts required by law to be withheld.

* * *" (Emphasis added)

Section 1673, 15 U.S.C.A., in pertinent part is as follows:

"Sec. 1673. Restriction on garnishment.

(a) Maximum allowable garnishment.

* * * the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed

(1) 25 per centum of his disposable earnings for that week, or

* * * * * *

(c) Execution or enforcement of garnishment order or process prohibited.

No court of the United States or any State may make, execute, or enforce any order or process in violation of this section."

■ It seems clear that in ruling this matter the courts are not concerned with and should ignore any "label" given to the money due, i. e. wages, salary, commission, etc. The sole criteria for the exemption is that the funds ("earnings") subject to the garnishment, in fact and in a strict sense, represent "compensation" for "personal services".

■ We are dealing with the construction or interpretation of an exemption statute and in such an undertaking each case must be decided upon its own facts. Bethesda General Hospital v. State Tax Commission, 396 S.W.2d 631 (Mo.1965).

The garnishee, Kissick Truck Lines, was a common carrier of certain specified commodities in several midwestern states. However, it owned no trucking equipment, employed no drivers and it had no employees except office personnel. We glean from this record that its method of operation was to solicit freight from its customers and rent the necessary equipment to transport the freight, and thus fulfill its obligations as common carrier under contracts designated "Lease and Operating

1. The federal statute, 15 U.S.C., Section 1671 et seq., was adopted in 1968 (effective 1970). At that time, the Missouri statute, Section 525.030 RSMo 1969, V.A.M.S. provided that only 10% of any wages due to an "employee" who was the "head of a family" was subject to garishment. This statute was amended, however, to substantially conform with the federal law that the aggregate "earnings" of any individual, after deductions, subject to garnishment may not exceed 25%, and if such individual "is the head of a family and a resident of this state, ten percentum, whichever is less." Laws 1971, p. 465, S.B. 34, Sec. 1. This amendment also defines "earnings" as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus or otherwise." We are not confronted in this case with any claim that Muck is "head of a family" and thus entitled to a 90% exemption. No such exemption is recognized under the federal law.

Agreement". John B. Muck was such a lessor.

The agreement here involved was dated January 2, 1970 and was a printed form in which Kissick Truck Lines, Inc. was named as lessee and Muck as lessor. The subject matter of the lease was 8 tractors and 8 trailers, described and designated in an appendix to the agreement. The provisions of this lease (Garnishee's Exhibit A) may be summarized as follows:

1. Muck agreed to *"lease* and deliver complete possession and control" of the equipment to Kissick for a one-year period; provided that after the lease had been in effect for 30 days, either party could terminate by giving written notice.

2. Muck agreed to furnish all gas, oil, tires, license plates "and other expenses incidental to the operation and maintenance of said equipment". Muck agreed to *"indemnify against any liability for expense of labor,* materials or appliances purchased or used in connection" with the equipment "and for any loss or damage to said equipment."

3. Muck agreed (at his own expense) to paint and letter the equipment according to Kissick's specifications before delivery of the equipment.

4. Muck agreed to "observe all safety and other requirements" of the ICC and all other regulatory bodies and to pay all fines which may result from a failure to comply with such requirements.

5. Kissick agreed to maintain the required insurance coverage to cover the equipment for such periods as the equipment was "being used in connection with the transportation of property under the authority and with the authorization" of Kissick.

*Muck agreed to indemnify Kissick against liability arising from the negligence of the drivers of the trucks.*

6. Muck agreed to purchase liability and property insurance to insure his equipment at all times such equipment was not in use by Kissick.

7. All shipments were to be handled, billed and delivered in Kissick's name.

8. The compensation to Muck "for the use of the equipment" was to be:

75% of Kissick's revenues when tractors and trailers were used;

65% of Kissick's revenues when a tractor alone was used.

Muck also agreed to remit 10% of his revenues to Kissick for shipments hauled by Muck for himself.

9. Muck granted Kissick an "exclusive option to purchase the equipment" at any time during the lease "for the sum of $_____". (Amount not filled in)

10. "This *lease* shall supersede and cancel all such *lease* agreements heretofore entered into between the lessee and the lessor on the equipment herein." (Emphasis added)

The only witness to testify was Kenneth Smith, Executive Vice President of Kissick. He testified that Muck hired and paid the drivers of the equipment and that they were Muck's employees; that Muck's drivers picked up the freight and loaded and unloaded it; that Muck made safety inspections of the equipment; that Muck performed his own maintenance and repairs in his own shop; that Muck occasionally drove some of the equipment himself; that Muck sometimes solicited business for Kissick and was paid his percentage of the freight billings therefor and Muck was paid weekly upon the basis of his percentage of the billings as provided in the lease agreement.

It should be noted that throughout the pleadings and this record the parties referred to the arrangement between Muck

and Kissick as an "equipment rental" agreement or "lease".

It is clear that Muck did not occupy the traditional relationship of an employee of Kissick. There is no evidence that Kissick exercised any control over the details of the work of Muck or his drivers, other than to assign loads of freight to be hauled under its common carrier's permit, the details of the actual transportation being under the control and supervision of Muck. In return for this, Muck was not paid wages, salary or commission, but a fixed percentage, without deductions, of the revenue derived from such shipments. Since Muck did engage in personal activity in connection with this transportation and apparently exercised a substantial degree of supervision over the work, the arrangement cannot be viewed as strictly and solely a lease or rental situation. It partakes also of elements of an independent contractor relationship. Restatement of the Law of Agency 2d, Section 2, pp. 12–15; 56 C.J.S. Master and Servant § 3(1); Dean v. Young, 396 S.W.2d 549 (Mo.1965); Jokisch v. Life and Casualty Insurance Co., 424 S.W.2d 111 (Mo.App.1968); Handley v. State Division of Employment Security, 387 S.W.2d 247 (Mo.App.1965).

It is not necessary to the resolution of this case that we further distill or define the exact legal relationship of Muck-Kissick resulting in the existence of the fund here involved. It is sufficient for us to conclude that Muck under the facts and the law did not qualify for the statutory exemption either under the expressed and recorded intent of Congress or the terms of the act. He did not come within the descriptive ambit of a wage earner whose income and thus his employment (and the welfare of his family) would be jeopardized by burdensome garnishments or bankruptcy. Neither did his "compensation" depend upon "personal services" as used in the statute.

We hold that Muck did not come within the terms of Section 1672, 15 U.S.C., the Consumers Protection Act, and therefore was not entitled to the exemption therein provided from garnishment. The judgment of the trial court is supported by the law and the evidence, is not clearly erroneous, and is therefore affirmed.

All concur.