### In re Michael Warren LAWRENCE, Debtor.

#### No. 96–11249.

United States Bankruptcy Court, E.D. Tennessee, Southern Division.

Jan. 14, 1997.

Thomas E. Ray, Trustee, Ray & Bolen, Chattanooga, TN, for Debtor.

Richard P. Jahn Jr., Trustee, Chattanooga, TN.

William R. Sonnenburg, Assistant United States Trustee, Chattanooga, TN.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

Before the court is the trustee's objection to an exemption claimed by the debtor in the sum of $140,000. According to a stipulation of facts entered into by the parties, the debtor is engaged in business as a podiatrist and had accumulated $140,000 in accounts receivable from various patients at the time of his bankruptcy filing. In his schedule of exemptions he claimed 75% of these accounts receivable as exempt property under Tenn. Code Ann. § 26–2–106. The propriety of that claim is the issue in this case.

The parties disagree about the functioning of Tenn.Code Ann. § 26–2–106. Specifically, the trustee argues that § 26–2–106 merely limits the amount of earnings that may be garnished outside bankruptcy and does not purport to create an exemption within the purview of 11 U.S.C. § 522(b)(2)(A). He further argues that the accounts receivable of a professional podiatrist are not enough like wages or salary paid by an employer to an employee to qualify as "earnings" within the meaning of Tenn.Code Ann. § 26–2–105(1). The debtor, on the other hand, contends that the garnishment restriction effected by §§ 26–2–105, –106 constitutes a kind of state exemption recognizable by 11 U.S.C. § 522(b)(2)(A) and that the debtor's accounts receivable qualify for exemption under the state statute. For the reasons that follow, the court concludes that the Tennessee garnishment statute does not create an exemption cognizable in bankruptcy.

### I.

In 1968 Congress passed the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. §§ 1671–77, which imposed nationwide restrictions on garnishments in order to protect debtors from what Congress believed to be the predatory lending practices of some credit institutions. In so doing, Congress provided that the CCPA would preempt any less protective state statutes, 15 U.S.C. § 1673(c), and so Tennessee, like many other states whose garnishment laws had been rendered obsolete, eventually enacted its own version of the CCPA, adopting the operative provisions of the CCPA almost verbatim. Tenn.Code Ann. §§ 26–2–105, –106 ("garnishment statute"). Both statutes provide in their material parts that

> [t]he maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed
>
>> (1) Twenty-five percent (25%) of his disposable earnings for that week....

Tenn.Code Ann. § 26–2–106(a); *see* 15 U.S.C. § 1673(a). Both statutes define earnings as

> compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.

Tenn.Code Ann. § 26–2–105(1); 15 U.S.C. § 1672(a). They also define garnishment as

> any legal or equitable procedure through which the earnings of an individual are required to be withheld for the payment of any debt.

Tenn.Code Ann. § 26–2–105(3); 15 U.S.C. § 1672(c).

■ The debtor argues that a bankruptcy case fits the foregoing definition of "garnishment" and that Tennessee, by the enactment of this garnishment statute, must have intended to allow a debtor to exempt 75% of his disposable earnings *in bankruptcy*.[1] The trustee insists that the garnishment statute does not create an exemption in bankruptcy

because it does not use any form of the word "exempt" and in its own terms purports to do nothing more than limit the amount of earnings that may be garnished in the hands of a third party.

■ Before resolving this question, it must be observed that the answer does not turn entirely upon state law. The exemption provision of the Bankruptcy Code allows a debtor to "exempt from property of the estate" such property as is "exempt under ... State ... law," 11 U.S.C. § 522(b)(2)(A). While it is certainly fitting for a state to declare a list of assets that it considers to be exempt from the reach of creditors and therefore exempt in bankruptcy, the question of whether an asset is exempt in bankruptcy is ultimately a question of federal, not state, law. This is so because the word "exempt" as used in § 522(b)(2)(A) must be given the meaning intended by Congress. In bankruptcy, property of the debtor that is "exempt from property of the estate" is property that the debtor may sequester to himself forever beyond the reach of his creditors in bankruptcy. Exempt property is subtracted from the estate, and no creditor will benefit from it in distribution. Furthermore, no creditor may attempt to execute on it thereafter because the debtor's obligation to the creditor will have been discharged and the debt itself wiped out. The discharge injunction will also be in full force and effect. 11 U.S.C. § 524(a). Thus, the effect of exempting property in bankruptcy is to sequester the property from creditors in the most complete and permanent way by removing it from the estate while destroying the very debtor-creditor relationship that would otherwise permit creditors to threaten property with execution, seizure, or attachment.

Of course, state exemption laws cannot destroy the debtor-creditor relationship by discharge, but they do sequester certain assets of the debtor from his creditors, at least while those assets are maintained in their exempt forms. These are the kinds of exemptions Congress must have had in mind when it permitted debtors in bankruptcy to

---

1. Tennessee is an "opt out" state which requires its citizens who file in bankruptcy to rely on the normal exemptions granted by state laws rather than those enumerated in 11 U.S.C. § 522(d). Tenn.Code Ann. § 26–2–112.

exercise state exemptions as alternatives to those in the federal list. *See* 11 U.S.C. 522(d). The question in this case is whether Congress also intended to allow statutes, such as Tennessee's garnishment statute, which operate in some other manner and do not sequester property to the debtor in the usual way, to exempt property from property of the estate in bankruptcy.

## II.

The Bankruptcy Code provision for recognizing state exemptions is evidently designed to secure the same treatment to a debtor who is forced to the point of claiming exemptions, whether he is in or out of bankruptcy. If a state permits a debtor to sequester certain assets from his creditors, then the Bankruptcy Code does likewise. But what if the Tennessee garnishment statute does not permit full sequestration from creditors and instead merely limits the amount a creditor can obtain from a third-party garnishee? Does the Bankruptcy Code recognize that mechanism as an "exemption" to be applied in bankruptcy proceedings?

The mechanism is decidedly different from other Tennessee statutes creating exemptions. Wherever else Tennessee has sought to create an exemption, it has provided that the property in question shall be "exempt from execution, seizure or attachment," Tenn.Code Ann. §§ 26–2–102, –111, or, if the property may be in the hands of a third person, "exempt from execution, attachment or garnishment." Tenn.Code Ann. §§ 26–2–104, –110. This kind of language directly prohibits the creditor from subjecting the exempt property to his debt, and the prohibition is permanent: the debtor may keep his exempt property from creditors forever. The garnishment statute, which is found among those just mentioned, does not prohibit execution, seizure, or attachment of property (wages) in the hands of the debtor. It merely limits to 25% the amount of disposable earnings that may be "subjected to garnishment." Tenn.Code Ann. § 26–2–106(a). As for the creditor's access to the remaining

75% of the debtor's wages once they are paid over to the debtor, the statute says nothing.

■ In the absence of a statute exempting wages from execution, seizure, or attachment, there seems to be no prohibition against a creditor seizing cash in the debtor's hands or in his bank account, even where the cash is directly traceable to wages. Tennessee does have a general personal property exemption worth $4000 that could be used by any debtor to exempt his unpaid wages, Tenn.Code Ann. § 26–2–102, but Tennessee does not specifically exempt wages or earnings [2] as some states do, although it certainly knows how to. In the statute next preceding the garnishment statute, Tennessee provided that

> [a]ll moneys received by a resident of the state, as a pension from the state of Tennessee, or any subdivision or municipality thereof, *before receipt, or while in his hands or upon deposit in the bank, shall be exempt from execution, attachment or garnishment* whether such pensioner is the head of a family or not.

Tenn.Code Ann. § 26–2–104 (emphasis added). This statute, covering a situation almost identical to that in which a debtor is about to receive unpaid earnings, directly provides for a total exemption, not just a limitation on garnishment, by making the pension moneys exempt from execution and attachment as well as garnishment. Furthermore, it specifically covers the periods of time both before and after receipt of pension moneys by the debtor. The existence of this statute is proof that Tennessee is capable of drafting the kind of statute the debtor wishes were available to him in bankruptcy. Its immediate proximity to the garnishment statute also makes it a possibility that the Tennessee General Assembly considered its language for the strikingly similar situation of unpaid wages, then rejected it as overbroad, preferring a mere limitation on garnishments instead.

If there is no general exemption for wages in Tennessee, then a creditor can pursue wages once they have been paid over to the

---

**2.** Throughout this general discussion of exemptions, the terms "wages" and "earnings" are used interchangeably for convenience, even

though the latter is certainly broader than the former.

debtor, and, if the debtor cannot protect the wages in his own hands, then it is questionable whether the wages are "exempt." There are no Tennessee cases construing the garnishment statute as either permitting or prohibiting a creditor's execution on a debtor's wages in the debtor's hands, but other states have considered this question and come to varying conclusions, usually depending on variations in the statute under construction. In *Daugherty v. Central Trust Co. of Northeastern Ohio*, 28 Ohio St.3d 441, 504 N.E.2d 1100 (1986) (per curiam), the court held that a debtor's earnings retained their exempt status when received by the debtor and deposited into his bank account. In so holding, however, the court noted the difference between the Ohio garnishment statute and its federal counterpart, the CCPA, pointing out that the Ohio statute was "not so narrowly drafted ..." in that,

> [u]nlike the Consumer Credit Protection Act, R.C. 2329.66(A) protects the funds concerned *not only from garnishment, but also from attachment and execution*. Thus, in contrast to the Consumer Credit Protection Act, the General Assembly apparently did intend to restrict creditors' access to exempt wages by providing for protection from attachment of such monies while in the hands of the employee.

*Id.* 504 N.E.2d at 1103 (emphasis added). The Tennessee statute, as previously noted, only protects the funds in question from garnishment and does not limit any other form of execution.

In *MidAmerica Savings Bank v. Miehe*, 438 N.W.2d 837 (Iowa 1989), the court held that exempt earnings retained their exempt status in the hands of the debtor and could not be levied on in his bank account. The Iowa garnishment statute in question provides that earnings are "exempt from garnishment," Iowa Code Ann. § 642.21, and the court, noting the state's history of granting a complete exemption for personal earnings and some "broad policy considerations," *id.* at 838, held that as a policy matter it was necessary to protect wages in the hands or bank account of the debtor in order for the debtor to enjoy the benefits of the garnishment statute. The court discounted the fact that the state legislature had changed the statute from one that exempted earnings from "liability for debt" to one merely exempting them "from garnishment." Other courts have thought such changes to be significant indicators of legislative intent to *abandon* the full exemption of wages. *Cf. Frazer, Ryan, Goldberg, Keyt & Lawless v. Smith*, 184 Ariz. 181, 185, 907 P.2d 1384, 1388 (1995) (noting that legislature's repeal of a partial wage exemption statute in favor of a statute like the CCPA "sharply suggest[ed] that the legislature chose not to permit any such exemption to survive.").

In the only federal case construing a state garnishment statute modeled on the CCPA, the district court followed an old but still viable Colorado Supreme Court case holding that earnings did not lose their exempt status upon deposit into a bank account. *Morrison v. Kobernusz (In re Kobernusz)*, 160 B.R. 844 (D.Colo.1993). The court indicated that it would have reached a different conclusion if it had been applying the CCPA, *id.* at 847, and in any event Tennessee has no comparable case on which the debtor may rely.

Other states have taken the position that earnings, once in the hands of the debtor, are not exempt from execution despite the existence of a garnishment limitation statute. *Frazer, Ryan, Goldberg, Keyt & Lawless v. Smith*, 184 Ariz. 181, 185, 907 P.2d 1384, 1388 (1995) (noting the similarity between Arizona's garnishment statute and the CCPA and observing that the courts considering whether the CCPA extends an exemption to earnings in the hands of the debtor have "uniformly" held that it does not); *Caulley v. Caulley*, 777 S.W.2d 147, 150–51 (Tex.App. 1989), *aff'd in part and rev'd in part*, 806 S.W.2d 795 (1991) (holding that earnings in the hands of the debtor are no longer protected by the Texas Constitution's prohibition against wage garnishments and further noting that the CCPA does not protect earnings once they have come into possession of the debtor); *Ellis Sarasota Bank & Trust Co. v. Nevins*, 409 So.2d 178, 179 (Fla.App. 1982) (holding that Florida garnishment statute did not extend protection to earnings directly deposited in debtor's bank account

by his employer). The state cases, both for and against exempting earnings that have been paid over to the debtor, usually hinge on the wording of the state statute in question. As noted by several of the courts, however, the great weight of authority holds that the CCPA does not extend protection to earnings once they have left the employer's hands. This is significant in the case at bar because Tennessee's garnishment statute is virtually a copy of the CCPA and so, absent any contradictory Tennessee authority, competent explanations of how the CCPA functions should carry some weight in determining how the facsimile Tennessee statute functions.

In *Usery v. First National Bank of Arizona*, 586 F.2d 107 (9th Cir.1978), the Ninth Circuit held that a bank served with a garnishment was under no duty to determine whether or to what extent its depositor could claim an exemption under the CCPA. In *Usery* the Secretary of Labor argued that earnings deposited in the debtor's bank account kept their exempt status because 15 U.S.C. § 1672(a) defined earnings as "compensation *paid* or payable" for personal services (emphasis added). The court of appeals directly rejected this argument, stating, "We think the statutory scheme, the legislative history, and the case law refute the Secretary's theory...." *Id.* at 108. After noting the practical difficulties a non-employer bank would encounter in computing any exemption claimed under the CCPA, the court considered Congress' intentions in the matter and found that, where Congress intended to exempt income in the hands of a debtor, it made its intentions clear.

In *Porter* [*v. Aetna Casualty & Sur. Co.*, 370 U.S. 159, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962) ] the Court held that veterans' benefits remain exempt from process even when deposited in a federal savings and loan association account. However, the statute interpreted by the Court in that case explicitly stated that such benefits

> shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.

38 U.S.C. § 3101(a).

*Id.* at 111. The court then concluded "that in drafting the Consumer Credit Protection Act Congress would have chosen similar unequivocal terms to restrict garnishment of wages *already received by an employee* if it had intended such a restriction." *Id.* (emphasis added).

The court also observed that Congress had used similar language in the Social Security Act.

> The Social Security Act, interpreted in *Philpott* [*v. Essex County Welfare Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973) ] to protect from legal process social security payments on deposit in a bank account, has similarly broad language:
>
> > [N]one of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process....
>
> 42 U.S.C. § 407.

*Id.* The court concluded again that "[i]f Congress had meant to restrict creditors' access to wages even after they left the control of the employer, it seems anomalous that it did not provide for protection from attachment of such monies *while in the hands of the employee*, as they did in the case of social security benefits." *Id.* (emphasis added).

In *Dunlop v. First National Bank of Arizona*, 399 F.Supp. 855 (D.Ariz.1975), the court held that the CCPA did not protect from garnishment wages deposited in the debtor's bank account, finding that the statute was "concerned with the regulation of the garnishment process itself and not the protection of a given fund." *Id.* at 857. *Dunlop* was followed by the Supreme Court of Wisconsin in *John O. Melby & Co. Bank v. Anderson*, 88 Wis.2d 252, 276 N.W.2d 274 (1979), wherein the court held that the CCPA did not protect earnings once they had been paid over and deposited in the debtor's bank account. Agreeing with *Dunlop* that the CCPA was designed to regulate a specific process rather than protect a given fund, the court concluded:

> It could not be clearer that the Congress was concerned with the protection of earn-

ings in the ordinary payroll process. There is nothing to suggest that the restrictions on garnishment were intended to apply to wages after they had been paid over to the worker.

*Id.* 276 N.W.2d at 277–78. Following *Melby* is *Edwards v. Henry,* 97 Mich.App. 173, 293 N.W.2d 756 (1980), which also held that the CCPA did not protect wages deposited into the debtor's bank account.

Interestingly, the *Edwards* court stated that "there exists no split of authority in the Federal courts concerning the interpretation of the federal statute" on this issue, and the court in *Frazer, Ryan, Goldberg, Keyt & Lawless,* 184 Ariz. at 185, 907 P.2d at 1388, stated that "[t]he courts that have considered whether the federal garnishment exemption extends to earnings disbursed to the judgment debtor's bank account have uniformly held that it does not." Actually, there is a case from the district court of North Dakota holding that wages paid to a debtor retain their status as disposable earnings under the CCPA and may not be executed on in the hands of the debtor. *Hodgson v. Christopher,* 365 F.Supp. 583, 587 (D.N.D.1973). In reaching its conclusion, however, the court relied on *In re Cedor,* 337 F.Supp. 1103 (N.D.Cal.1972), whose reasoning was adopted in a three-sentence per curiam opinion by the Ninth Circuit, *In re Cedor,* 470 F.2d 996 (9th Cir.1972). The reasoning in *Cedor* was later rejected by the Second Circuit in *In re Kokoszka,* 479 F.2d 990 (2d Cir.1973), and again by the Supreme Court when it affirmed the Second Circuit in *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974).

The question in *Cedor* and in *Kokoszka* was whether a debtor in bankruptcy could shelter 75% of an income tax refund under the provisions of the CCPA on the theory that the tax refund was obviously made up only of wages and that a bankruptcy was in effect a garnishment of those wages as defined in 15 U.S.C. § 1672(c). *Cedor* accepted

this theory and allowed the debtors to reclaim 75% of the tax refund held by the trustee, but the Second Circuit in *Kokoszka* disagreed, holding that tax refunds were not "earnings" despite the easy trace because Congress had intended the garnishment limitation to affect only periodic payments of compensation between employer and employee. 479 F.2d at 996–97.

On certiorari, the Supreme Court undertook a review of the purposes of the CCPA and concluded in effect that the CCPA was not intended to function as an exemption in bankruptcy.

> An examination of the legislative history of the Consumer Protection Act makes it clear that, while it was enacted against the background of the Bankruptcy Act, *it was not intended to alter the clear purpose of the latter Act to assemble,* once a bankruptcy petition is filed, *all of the debtor's assets for the benefit of his creditors.*

*Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974) (emphasis added). This effectively repudiated the broad claim made by the debtor that the CCPA operates as a de facto exemption in bankruptcy. The Court went on to explain that "[i]ndeed, Congress' concern was not the *administration* of a bankrupt's estate but the *prevention* of a bankruptcy in the first place ...," *id.,* and it summed up its view of congressional intent by saying that

> [i]n short, the Consumer Credit Protection Act sought to prevent consumers from entering bankruptcy in the first place. However, if, despite its protection, bankruptcy did occur, the debtor's protection and remedy remained under the Bankruptcy Act.

*Id.*

Thus, the Court made it clear that it thought that the CCPA was designed to operate prior to bankruptcy, not within it as some sort of an exemption. The debtor had argued that the CCPA was indeed an exemption in bankruptcy,[3] and that was the argu-

---

**3.** "Petitioner argues that the Consumer Credit Protection Act's restrictions on garnishment, 15 U.S.C. § 1671 et seq., are such an exemption. In essence, the petitioner's position is that a tax refund, having its source in wages and being completely available to the taxpayer upon its return without any further deduction, is 'disposable earnings' within the meaning of the statute. 15 U.S.C. § 1672(b). He further argues that the taking of custody by the trustee is a 'garnishment' since a bankruptcy is a 'legal or equitable procedure through which the earnings of any

ment targeted by most of the language in the Court's opinion, though the case was decided more narrowly by affirming the lower court's conclusion that a tax refund was not "earnings" within the meaning of the statute. In its final comment on the subject, however, the Court stated:

> There is every indication that Congress, in an effort to avoid the necessity of bankruptcy, sought to *regulate garnishment in its usual sense* as a levy on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis. There is no indication, however, that Congress intended drastically to alter the delicate balance of a debtor's *protections* and obligations during the bankruptcy procedure.

*Id.* (emphasis added). Since exemptions were the "protections" at issue in the case, the Court is strongly implying, if not stating, that the CCPA was never intended to operate in bankruptcy.

This conclusion is supported by reference to the legislative history of the CCPA, which contains not a hint of any such bankruptcy application. H.R.Rep. No. 90–1040 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1962–63, 1977–79. It would have been difficult for Congress to have intended the application of the CCPA as a full-scale exemption in bankruptcy and not have mentioned this in the fairly extensive legislative history. Moreover, had Congress intended the CCPA to operate as a general wage *exemption* to the extent of 75% of wages, one might expect to find the exemption enumerated in 11 U.S.C. § 522(d), the list of federal exemptions recognizable in bankruptcy. Of course, it is not there.

It is true that the first section of the CCPA, which contains Congress' findings and a declaration of purpose, mentions uniformity of bankruptcy laws as a congressional consideration in enacting the CCPA.

(a) The Congress finds:

(1) The unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit. Such extensions of credit divert money into excessive credit payments and thereby hinder the production and flow of goods in interstate commerce.

(2) The application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, and the resulting disruption of employment, production, and consumption constitutes a substantial burden on interstate commerce.

(3) The great disparities among the laws of the several States relating to garnishment have, *in effect, destroyed the uniformity of the bankruptcy laws* and frustrated the purposes thereof in many areas of the country.

(b) On the basis of the findings stated in subsection (a) of this section, the Congress determines that the provisions of this subchapter are necessary and proper for the purpose of carrying into execution the powers of the Congress to regulate commerce and to establish uniform bankruptcy laws.

15 U.S.C. § 1671 (emphasis added).

Although Congress does mention "uniformity" of bankruptcy laws, the language employed in subsection (a)(3) makes it clear that Congress' concern was the disparity among state garnishment laws that *"in effect,* destroyed the uniformity of the bankruptcy laws and frustrated the purposes thereof in many areas of the country." 15 U.S.C. § 1671(a)(3) (emphasis added). Because varying state laws cannot actually destroy the uniformity of bankruptcy *law,* which in itself is uniform and supreme by definition, what Congress here refers to is the *effect* a draconian garnishment law in one state may have in causing a large number of individual bankruptcies as compared with the smaller number of bankruptcies in a neighboring state with a more lenient garnishment statute. The effect of this disparity is not really on the bankruptcy law itself, but on the state

individual are required to be withheld for payment of any debt.' § 1672(c)." 417 U.S. at 649,

94 S.Ct. at 2435.

pools of potential bankrupts. Congress desired greater uniformity in the pools.

■ Congress' solution to this problem was the application of the CCPA to the states by preemption of any less protective state laws. That application created greater uniformity, from state to state, in the pools of persons likely to seek bankruptcy protection, as well as having a broader ameliorative effect outside bankruptcy. Thus, subsection 1671(a)(3) does not mean that Congress intended to import the CCPA into the Bankruptcy Code as a nationwide exemption in the full sense of the term. What it had in mind was a broader method of abating the harshness of some state garnishment laws, understanding that this would result in greater uniformity in the kind and number of persons forced into bankruptcy.

The reference to "uniform bankruptcy laws" in § 1671(b) is made in connection with the congressional determination therein that the CCPA is "necessary and proper" legislation under the Constitution. Again, this is fully consistent with the idea that the CCPA, while operating outside bankruptcy, serves indirectly the uniformity of bankruptcy law by its tendency to equalize among states the pressure to resort to bankruptcy. The CCPA thus operates at the door of bankruptcy, but not inside, as the Supreme court explained in *Kokoszka*. That is how it enhances uniformity.

As has now been shown, almost all the cases interpreting the CCPA, both state and federal, have held that the federal statute does not prevent creditors from pursuing earnings once they are in the hands of the debtor. Subchapter II of Chapter 41, Title 15, United States Code, which comprises the CCPA, is entitled, "Restrictions on Garnishment," and that seems to be descriptive of its limited purpose—moderating the severity of garnishments to prevent bankruptcies. Nevertheless, some courts have pointed out that allowing creditors to pursue earnings in the hands of the debtor obviously affords the debtor less protection than he would have under a wage exemption statute that extended protection to a defined fund of wages. *See, e.g., Frazer, Ryan, Goldberg, Keyt & Lawless v. Smith*, 184 Ariz. at 185, 907 P.2d

at 1388; *In re Kobernusz, 160 B.R. at 848; MidAmerica Savings Bank v. Miehe*, 438 N.W.2d at 839. That is certainly true, and choices must be made.

■ The choice between a limitation on the process of garnishment and the full protection of a fund by exemption is, of course, a matter of policy for the state and federal legislatures. Congress certainly could have chosen to protect a fund represented by 75% of a debtor's wages by exempting them entirely, but it did not do so, although it is well acquainted with the procedure. Congress could also have provided, as some states do, that wages in the hands of debtors receive protection from all forms of execution for some specific period of time while the fund remains uncommingled and traceable to wages. It did not do this either. Finally, Congress could have established a wage exemption in § 522(d) of the Bankruptcy Code, where it set forth a long list of other exemptions. Of course, it did not do so. Possibly, in choosing a lesser level of protection for wages, Congress took a quite practical view of things and reflected on the difficulties a creditor will always have in levying on cash in the hands of a debtor already alerted to his peril by the loss of 25% of his wages. Thus Congress may have concluded that a full wage exemption was unnecessary in practice, and Tennessee might also have thought such a balance reasonable when, in light of *Kokoszka* and *Dunlop*, which had been in the books for years, it decided to copy the CCPA. Relying on the foregoing authorities, this court concludes that the Tennessee garnishment statute is not a general wage exemption statute and that, like the CCPA, it only regulates the process of one form of execution: the garnishment of earnings in the hands of a third person.

### III.

In bankruptcy, property that is granted exempt status is withdrawn from the property of the estate and can never thereafter be reached by the creditors in bankruptcy, whose claims are annihilated by the discharge and who are forever barred from pursuing those claims by the discharge injunction in 11 U.S.C. § 524(a). If a state

statute does a great deal less than this, the question arises whether that statute should be recognized as creating an "exemption" within the cognizance of the Bankruptcy Code.

■ The essence of an exemption is the sequestration of property from creditors, usually by placing it completely beyond the reach of judicial process for as long as it maintains its exempt form and character. That is how the Tennessee exemptions mentioned earlier work. They place certain property beyond "execution, seizure or attachment," Tenn.Code Ann. §§ 26–2–102, – 103, –111, or beyond "execution, attachment or garnishment." Tenn.Code Ann. § 26–2–110. The garnishment statute, on the other hand, seems to do something else. There is no evidence in Tennessee jurisprudence that it was meant as a general wage exemption statute, and indeed its federal counterpart, the CCPA, is construed only as a limitation on garnishments, not as something broader. The Tennessee statute accomplishes no real sequestration of earnings in the debtor's hands, and it appears that creditors are free to use all available process to execute on whatever earnings are eventually paid over to the debtor. The statute merely makes this more difficult by cutting off the easiest route to quick payment. Thus, the statute does not have an effect equivalent to the powerful bankruptcy effect of an exemption, which is to "exempt from property of the estate" the asset in question and thereby put it permanently beyond the reach of existing creditors.

Within the Bankruptcy Code, the word "exempt" must be given the meaning Congress attributed to it when it used the word. Congress used it in connection with setting up a program of exemptions to take property out of the estate, a program that in the end operates to deprive creditors completely of their opportunities to seize and sell the exempt property, since in bankruptcy they have recourse only to the estate. The Tennessee garnishment statute does not permanently place a debtor's earnings beyond the reach of creditors' executions and therefore cannot be said to create an exemption of the kind Congress had in mind when it provided that property "exempt under ... State ... law" would also be exempt from property of the estate in bankruptcy. 11 U.S.C. § 522(b).

Of course, generically speaking, the Tennessee garnishment statute can be loosely called an "exemption" insofar as it temporarily restricts a creditor's efforts to seize earnings. But those earnings are really "exempt" only in the hands of the garnishee, not the debtor, and the end result of the statute's operation—the temporary protection of funds in the hands of a third party—is meaningless in bankruptcy where the material question is who will *ultimately* have these moneys, the debtor or his creditors? Thus the better view is that the statute does not function as an exemption in bankruptcy, but rather, as the Supreme Court explained in *Kokoszka,* precedes and prevents bankruptcy.

The debtor relies on *In re Duncan,* 140 B.R. 210 (Bankr.E.D.Tenn.1992), in which the court held that an insurance agent could exempt in bankruptcy 75% of the renewal commissions due him under the Tennessee garnishment statute. In *Duncan,* however, the trustee did not argue the inapplicability of the Tennessee garnishment statute in bankruptcy, and so the court was not presented with issue now before this court.

The debtor also relies on *In re Sanders,* 69 B.R. 569 (Bankr.E.D.Mo.1987), in which the court applied Missouri's garnishment statute, which is very similar to Tennessee's, in a bankruptcy proceeding to exempt 75% of the accrued wages of a debtor. In deciding the case, the court relied entirely on a law review article to conclude, erroneously in this court's opinion, that the CCPA created a general wage exemption. The law review article argued:

> To interpret *Kokoszka* as holding that title III is not an exemption under federal law *at all,* as courts recently have been doing, ... is unwarranted. In the first place, if *it* is not an exemption law, then it is difficult to say *what is.*

*Id.* at 571 (quoting Vukowich, *Debtor's Exemption Rights Under The Bankruptcy Reform Act,* 58 N.C.L.Rev. 769, 791 n. 192 (1980)). This court disagrees with the law

review article's conclusion and believes that it has shown what an exemption cognizable in bankruptcy really is: one that sequesters property *in the debtor* such that it cannot be reached by creditors' process. It must have an effect under state law similar to withdrawing property from the estate in bankruptcy. If it does not have this effect, it is no exemption.

Thus, in this court's view, *Sanders* mistakenly concluded that the CCPA, and perhaps the Missouri statute based on it, constituted wage exemption statutes. It then went on to decide the case by rejecting four arguments made by the trustee, none of which are pertinent to the case at bar. Because *Sanders* started from a position this court considers incorrect, this court does not find it persuasive.

### IV.

The debtor in this case is owed a substantial sum of money by his patients. If he had collected these accounts receivable and deposited the entire $140,000 in his bank account before bankruptcy, is there any doubt but that his judgment creditors could have executed on that money to satisfy their judgments? They could certainly do so unless Tennessee exempts wages from creditors' debt collection procedures. Although the debtor is unable to cite any Tennessee authority for the existence of such a wage exemption, he argues that the court should stretch the garnishment statute into a wage exemption statute, thereby permanently sequestering to the debtor 75% of his unpaid earnings. That result is not possible outside bankruptcy unless the garnishment statute is really a wage exemption statute in disguise, and that is highly unlikely because the Tennessee garnishment statute is cloned from the CCPA, which is almost uniformly interpreted as a garnishment limitation statute only—one that regulates a process instead of protecting a particular fund. Designating a fund for complete protection would have been easy, and both Congress and the Tennessee General Assembly have shown themselves adept at doing so. The best evidence is that Tennessee did no such thing and therefore has no general wage or earnings exemption in its laws. Accordingly, the debt-

or will be unable to avail himself of the exemption claimed in this case because the moneys he seeks to sequester to himself are not "exempt under . . . State . . . law."

Because the court concludes that the Tennessee garnishment statute does not create an exemption recognizable in bankruptcy, it is unnecessary to address the trustee's other argument that these particular accounts receivable are not "disposable earnings" under the garnishment statute. An order will enter sustaining the trustee's objection to this claim of exemption.