# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

---

No. 98-6070 NE

---

In re:                              *
                                    *
Marion F. Pruss,                    *
                                    *
        Debtor.                     *
                                    *
Marion F. Pruss,                    *        Appeal from the United States
                                    *        Bankruptcy Court for the
        Appellant,                  *        District of Nebraska
                                    *
            v.                      *
                                    *
Richard J. Butler, and              *
Kathleen Laughlin, Trustee,         *
                                    *
        Appellees.                  *

---

Submitted: March 3, 1999
Filed: June 8, 1999

---

Before KRESSEL, SCHERMER and DREHER, Bankruptcy Judges

SCHERMER, Bankruptcy Judge

        Marion F. Pruss, ("Ms. Pruss" or the "Debtor") a practicing attorney and debtor under Chapter 13 of the United States Bankruptcy Code appeals from an order of the bankruptcy court denying her claim of exemption in a portion of her accounts receivable. The Debtor claimed the accounts receivable exempt under Neb. Rev. Stat. § 25-1558 which limits garnishment on earnings from personal services, whether denominated as wages, salary, or otherwise. The bankruptcy court held the accounts receivable were not the equivalent of

wages or salary and therefore were not exempt under the Nebraska statute. Because we interpret Neb. Rev. Stat. § 25-1558 as excepting from garnishment the portion of Ms. Pruss' accounts receivable attributable to her personal services as a self-employed individual, we reverse and remand.

## Background

Ms. Pruss is an attorney engaged in the practice of law as a sole practitioner. When she filed a Chapter13 bankruptcy petition on January 30, 1998, she owned accounts receivable from legal services billed to her clients. The scheduled value of these receivables was $41,000, of which Ms. Pruss claimed 75% exempt pursuant to Neb. Rev. Stat. § 25-1558. Her claim of exemption was, however, subject to the secured claim of Packer's Bank to whom Ms. Pruss pledged her accounts receivable for a past and current (post-petition) operating loan. The Chapter 13 Trustee, Kathleen Laughlin (the "Trustee"), and Richard Butler ("Mr. Butler"), the Chapter 7 Trustee of two other bankruptcy estates which are creditors of Ms. Pruss, objected to her claim of exemption on the grounds that the accounts receivable of a professional person who does not work for wages do not constitute disposable earnings as defined in Neb. Rev. Stat. § 25-1558. The Trustee and Mr. Butler, (collectively, the "Objectors") maintained that §25-1558 was intended to protect only the periodic income stream of individuals in a traditional employee-employer relationship and did not encompass accounts receivable of the self-employed.

The bankruptcy court agreed with the Objectors and denied the claim of exemption on three grounds. First, the court found significant that the statute speaks of "disposable earnings of an individual for any workweek" and concluded that the statute did not apply to the Debtor as a self-employed professional because there was no evidence that the accounts receivable were directly related to any particular workweek. Second, the court found that the accounts receivable did not fit within the statutory definition of "disposable earnings." Disposable earnings are defined in Neb. Rev. Stat. § 25-1558(4)(b) as "that part of the earnings of any individual remaining after deducting . . . any amounts required by law to be withheld," and as a self-employed professional, the bankruptcy court concluded that although Ms. Pruss would be required to make certain estimated tax deposits, she was not required to "withhold" any amounts from her gross receivables. Third, the court reasoned that Ms.

2

Pruss' prior pledge of the accounts receivable as collateral was inconsistent with Neb. Rev. Stat. § 25-1558(5) which prohibits assignment of wages or salary.  On this last point, the court reflected that the Debtor could not have it both ways; claiming the accounts partially exempt from garnishment as earnings from personal services while at the same time pledging the accounts as collateral for a loan.

On appeal, the Objectors echo the bankruptcy court's interpretation of the Nebraska statute, urging its application only to traditional employee situations. Conversely, Ms. Pruss places emphasis on the rationale of the statute and  urges that its purpose of protecting the periodic income of individuals applies equally well to the self-employed as to those in traditional master-servant relationships.

**Discussion**

The bankruptcy court's interpretation of the Nebraska garnishment and exemption statute is a question of law.  We review the bankruptcy court's legal conclusions de novo. *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 609 (8th Cir. 1997).  When interpreting a statute on appeal, this court looks to the statute's express language and overall purpose. *In re Burma Jean Martin (Martin v. Cox)*, 140 F.3d 806, 807-08 (8th Cir. 1998).  *See Graven v. Fink (In re Graven)*, 936 F.2d 378, 384-85 (8th Cir.1991).  The task begins where all such inquires must begin:  with the language of the statute itself.  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026,1030, 103 L.Ed.2d 290 (1989).  When a statute's language is plain, "'the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).   In relevant part, the Nebraska statute states:

> **§ 25-1558.  Wages; subject to garnishment; amount; exceptions.**
>
> (1)  Except as provided in subsection (2) of this section, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment shall not exceed the lesser of the following amounts:
> 
> (a)    Twenty-five percent of his disposable earnings for that week;
> 
> (b)    The amount by which his disposable earnings for that week exceed thirty times the federal minimum hourly wage prescribed

3

by § 29 U.S.C. 206(a)(1) in effect at the time earnings are payable; or

(c)    Fifteen percent of his disposable earnings for that week, if the individual is a head of a family.

. . . .

(4) For the purposes of this section:

(a)    Earnings shall mean compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program;

(b)    Disposable earnings shall mean that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld;

(c)    Garnishment shall mean any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt;
and

. . . .

(5) Every assignment, sale, transfer, pledge, or mortgage of the wages or salary of an individual which is exempted by this section, to the extent of the exemption provided by this section, shall be void and unenforceable by any process of law.

. . . .

(7) In the case of earnings for any pay period other than a week, the Commissioner of Labor shall by regulation prescribe a multiple of the federal minimum hourly wage equivalent in effect to that set forth in this section.

Neb. Rev. Stat. § 25-1558 (West WESTLAW through 1998 1st Sess).[1]

Our analysis of this statute begins with the definition of "earnings." Section 25-1558 (4)(a) defines "earnings" to mean "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, *or otherwise*, and includes periodic payments pursuant to a pension or retirement plan." Neb. Rev. Stat. § 25-1558(4)(a) (emphasis added). In this case, Ms. Pruss concedes that her accounts receivable are not

---

[1] All subsequent references are to this statute.

salary or wages, but she asserts that the receivables (at least the portion attributable to the legal services which she rendered, as contrasted with costs advanced on behalf of clients or fees billed for other attorneys) are nevertheless, compensation for Ms. Pruss' personal services.

This court agrees and finds that when an attorney performs legal services, the fees generated constitute "earnings" from the attorney's personal services. As such, the portion of the fees associated with the attorney's personal labor fall squarely within the statutory definition of "earnings" in Neb. Rev. Stat. § 25-1558. Labeling the Debtor's earnings as "accounts receivable" rather than "accrued compensation" does not change the essential fact that these funds constitute compensation earned by the Debtor for rendering personal services. Indeed, every wage earner and salaried employee whose compensation is paid in arrears holds an account receivable; yet, the existence of such a receivable does not change the character of the compensation from earnings to some other category of income.[2]

Having established that the Ms. Pruss' receivables constitute "earnings," we next consider whether those earnings are "disposable earnings" for which the Nebraska statute provides exemption. Paragraph 4(b) of § 25-1558 defines "disposable earnings" to mean "that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld." Because a self-employed individual is not required to withhold federal income tax or social security, the court and the Objectors concluded that self-employed individuals do not have "disposable earnings" subject to protection under this statute. Similarly, because paragraph (1) of the statute couches its limitations on garnishment in terms of weekly wages, the bankruptcy court and Objectors reasoned that the statute protects only those in traditional employee/employer transactions whose compensation is related to particular work periods.

---

[2] The only distinction that might exist between the receivable of a self-employed individual and an employee, is the identity of the party obligated to pay the receivable. For the self-employed person, a third party client or customer is the party responsible for payment, whereas for an employee, the employer is the account debtor. The Nebraska statute does not specify by whom compensation is to be paid in order for the compensation to constitute "earnings." Thus, this distinction does nothing to advance our understanding of what constitutes earnings from personal services.

5

This court disagrees with these approaches because they look to the definition of disposable earnings in paragraph (4)(b) and use the method stated therein to determine what percentage of earnings are subject to garnishment, in order to define *whether* certain categories of earnings fall within the statute's protection in the first place. In other words, these approaches superimpose concepts from paragraph 4(b) onto the definition of "earnings" in paragraph 4(a). Rather, we think the language of paragraph (4)(a) is clear, and that our understanding of "earnings" should start and end there. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982), *quoted in Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031. Here, literal application produces a result that is consummately consistent with the plain meaning of the statute.

First, the statute itself states that "earnings" means "compensation paid or payable for personal services, whether denominated as wages, salary commission, bonus, *or otherwise*." Neb. Rev. Stat. § 25-1558(4)(a) (emphasis added). If the Nebraska legislature wanted to limit the nature of earnings to those of an employee in a traditional wage earner role, it could have done so in this definitional paragraph, but instead, the legislature chose to leave in the statute the expansive terms "or otherwise." Had the legislature wanted the statute more narrowly tailored, it could have done so, as it had done in other instances in this section. For example, paragraph (5) is limited to wages or salary. That paragraph renders void "[e]very assignment, sale, transfer, pledge, or mortgage of the wages or salary of an individual which is exempt under this section . . . " Neb. Rev. Stat. § 25-1558(5). It does not render void the pledge of other forms of compensation from personal services. Further, the use of "wages or salary" in paragraph (5), contrasts with the choice of the more general term "earnings" in paragraph (4)(c) which defines garnishment as "any legal or equitable procedure through which the earnings of an individual are required to be withheld for payment of any debt." Neb. Rev. Stat. § 25-1558(4)(c). The legislature obviously knew how to use the more general word (earnings) when intended in one portion of the statute and the more limiting words (wages or salary) when a restricted purpose was intended elsewhere.

Neither is the periodic nature of the payments particularly probative. Although paragraph (1) of the statute states its limitation in the context of a "workweek," paragraph

(7) requires the Commissioner of Labor to prescribe a minimum hourly wage equivalent to be applicable to earnings for any pay periods other than a week. Thus, we cannot conclude from paragraph (1) that only individuals with a traditional week-to-week means of compensation are covered by the statute. Rather, the statute applies generally to periodic payments for personal services, and although Ms. Pruss' accounts receivable admittedly include components other than her earnings, the portion of the receivables that constitutes earnings from her personal services can be linked to discreet periodic units of work time. Moreover, while Ms. Pruss is not compensated on a weekly or monthly basis, her earnings reflect amounts billed for legal services rendered over distinct time periods. The court also observes that similar criticisms concerning the relatedness of income to temporal work periods exit with respect to commissions and bonuses, and yet, both are specifically denominated as examples of "earnings" in paragraph (4)(a) of this statute. For these reasons, we do not find that the temporal reference in the definition of "disposable earnings" furthers our analysis of whether a portion of the accounts receivable of a sole practitioner are exempt under this statute.

Likewise, we reject the notion that a source of compensation that qualifies as "earnings" under paragraph (4)(a) is incapable of fitting within the definition of "disposable earnings" simply because the payor of those funds is not required to withhold taxes or similar payments prior to remitting compensation to the income earner. Disposable earnings under the statute are those "earnings" left after deducting amounts required to be withheld. In the typical employee/employer situation, this provision protects the employee by subjecting to garnishment only the net portion of his income after payment of taxes, social security and other mandatory withholding. In the context of a self-employed individual, since the remittor of funds is not required to withhold any amounts, the entire portion of the payment reflecting compensation for the individual's personal services constitutes her "disposable earnings." The absence of withholding does not preclude a self-employed individual from the benefits of the garnishment exemption statute. To hold otherwise would reach the absurd result that, in the case of an attorney, the exemption would be available to a sole practitioner who works through his or her own professional corporation but would not be available to the sole practitioner who avoids the mechanics of incorporation.

7

In concluding that exempt "earnings" under this statute can include sums earned by a self-employed individual for personal services even though paid or payable from clients or customers, we have guided ourselves by the canons of interpretation which require that a term should be known from its associates and that we must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Eilbert v. Pelican (In re Eilbert)*, 162 F.3d 523, 527 (8th Cir. 1998) (*quoting Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). In this sense, we do not think all amounts due the Debtor constitute "earnings" or "disposable earnings," but only those portions attributable to the Debtor's own personal services, as contrasted with amounts attributed to the services of others or amounts reflecting profits or investment income. We find this interpretation gives meaning to the term "or otherwise" in Neb. Rev. Stat. § 25-1558(4)(a), and yet does not render the concept of earnings so broad that it is inconsistent with the purpose of the statute. Rather, we find that our interpretation is consistent with the statute's goal of protecting income earned from personal labor and services as contrasted with income from investments or other sources.

Because we believe the language of Neb. Rev. Stat. § 25-1558 is clear, we look to the legislative history only to verify that our plain reading is consistent with the statute's purpose. The Nebraska statute follows the Consumer Creditor Protection Act. 15 U.S.C.A. §§ 1671-1677 (1998) (the "CCPA"). That act requires state garnishment exemption statutes to comply with federal limitations on amounts that may be garnished. Consequently, most state wage garnishment exemption statutes track the language of the federal act. Nebraska's statute follows the identical language of the federal act. The Supreme Court interpreted the federal act in *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974), and determined that a tax refund did not constitute "disposable earnings" within the definition of the CCPA and therefore could not be exempt from administration in Mr. Kokoszka's bankruptcy case. In reaching this decision, the Supreme Court analyzed the purpose of the CCPA, stating that

> Indeed, Congress' concern [in passing the act] was not the administration of a bankrupt's estate but the prevention of a bankruptcy in the first place by eliminating 'an essential element in the predatory extension of credit resulting

8

in a disruption of employment, production, as well as consumption' and a consequent increase in personal bankruptcies.

*Id.* at 650, 94 S.Ct. at 2436 (quoting H.R. REP. NO. 1040, 90th Cong., 1st Sess., 20 (1967)).

The Court continued to cite the legislative history of the CCPA, explaining that "[t]he limitations on the garnishment of wages adopted . . . while permitting the continued orderly payment of consumer debts, will relieve countless honest debtors driven by economic desperation from plunging into bankruptcy in order to preserve their employment and insure a continued means of support for themselves and their families."

*Id.* at 651, 94 S.Ct. at 2436 (quoting H.R. REP. NO. 1040, 90th Cong., 1st Sess., 21 (1967)).

From this history, the Supreme Court summarized that "Congress, in an effort to avoid the necessity of bankruptcy, sought to regulate garnishments in its usual sense as a levy on *periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis*." *Id.* (emphasis added).

This quotation, emphasizing that the CCPA was intended to protect "periodic payments . . . needed to support the wage earner . . ." provides the basis for a split of authority on whether the exemption statutes apply to self-employed professionals and independent contractors or whether the statutes are limited to wage earners in an employee-employer relationship who receive periodic compensation. Courts that have denied protection of the statute to independent contractors rely upon the express words in the statement of congressional intent concerning the periodic nature of payments to "wage earners," (*see Olson v. Townsend*, 148 Vt. 135, 530 A.2d 566 (1987); *Coward v. Smith*, 6 Kan. App.2d 863, 636 P.2d 793 (1981)); while those that extend protection of the statute look to the policy of the statute and conclude that the Congress' concerns apply equally to individuals working as independent contractors, as well as, to those engaged in traditional employee relationships. (*See In re Duncan*, 140 B.R. 210, 213 (Bankr. E.D. Tenn. 1992); *In re Sexton*, 140 B.R. 742 (Bankr. S.D. Iowa 1992); *Marian Health Center v. Cooks*, 451 N.W.2d 846 (Iowa Ct. App. 1989)).

9

We believe that the concerns which motivated Congress to enact limitations on garnishment apply with parallel force upon individuals who earn a living as independent contractors as they do upon employees in traditional wage earning positions. The better distinction, we find, is for the court to "distinguish[] between types of income, for example, income from investments versus income from personal services." *Marian Health Center v. Cooks*, 451 N.W.2d at 847-48. In *Kokoszka*, the Supreme Court recited that the CCPA did not protect all forms of compensation derived from personal services nor all assets traceable to such compensation. *Id.* at 651. We agree. The act does not protect <u>all</u> income derived from personal services, but it does protect income in the nature of wages or salary. The dissent's conclusion renders nugatory the "or otherwise" language in paragraph (4)(a) and erroneously fails to appreciate the relatedness and similar nature of a self-employed person's income from personal services, and the "wages" or "salaries" of a traditional employee. The dissent's understanding of "earnings" (through the gymnastics of the definition of "disposable earnings"), strips the self-employed debtor of all income by denying him any protection under the act. Such a reading makes it impossible for a self-employed person to support himself or his family and is inconsistent with the general policy of the act. While the dissent criticizes our interpretation of "earnings" as enabling professionals, entrepreneurs, and independent contractors to treat everything as disposable earnings (which we do not), the dissent's analysis protects none of the earnings of the self-employed -- a result which is hardly consistent with a holistic view of the statute.

We therefore, hold that the exemption for "earnings" from personal services contained in Neb. Rev. Stat. § 25-1558 is available to Ms. Pruss as a self-employed practitioner to the extent that the compensation sought by the Trustee to be applied in considering confirmation of Debtor's Chapter 13 plan is from Ms. Pruss' own independent services. This result, is also consistent with the directive that we are to construe exemption statutes liberally in favor of the debtor. *Wallerstedt v. Sosne (In re Wallerstedt)*, 930 F.2d 630, 631 (8th Cir. 1991); *In re Welborne*, 63 B.R. 23 (Bankr. D. Neb. 1986).

Finally, we reject the Objectors' assertion that the Debtor's prior pledge of her accounts receivable as collateral for an operating loan precludes the accounts from qualifying as exemptible disposable income. Neb. Rev. Stat. § 25-1558(5) specifically invalidates a pledge of only wages and salaries. Because Ms. Pruss' accounts receivable are comprised

10

not only of her personal earnings, but costs, other professional's time and hopefully, a profit, the court finds that the accounts are not fully within the ambit of paragraph (5). Moreover, even to the extent that Ms. Pruss has pledged funds which are the equivalent of wages or salaries, we need not be distracted by the potential invalidity of that pledge because the matter of the validity of the bank's lien in such accounts is not before this court today.

For the foregoing reasons, we reverse the decision of the bankruptcy court and remand for a determination of what portions of the Debtor's accounts receivable constitute funds that are exempt as the disposable earnings of the Debtor.

Dreher, J., DISSENTING:

I respectfully disagree. I, too, believe the language of § 25-1558 is clear; read *in pari materia*, this statute does not and was not intended to cover business income or profits in the form of accounts receivable generated by a professional. Rather, it was designed to protect from garnishment, and thereby indirectly provide an exemption for, the earnings of wage-earners engaged in traditional employer-employee relationships who are paid on a periodic regular basis. At a minimum, § 25-1558 is ambiguous and must be read in light of its abundant legislative history. The legislative history, developed case law, and the language of the statute itself suggest this result.

A.    THE HISTORY: THE CCPA AND THE ENACTMENT OF § 25-1558

Section 25-1558 was not written in a vacuum and it should not be interpreted in a vacuum. It has a long, rather distinguished, and quite interesting history.

Protection from excessive wage garnishment was first provided to debtors in Nebraska, as in many other Midwestern and Western states, in the late 1800's. Nebraska's first wage garnishment statute was passed in 1869. *See Live Stock Nat'l Bank v. Jackson*, 288 N.W. 515, 516 (Neb. 1939). It specifically protected only the "wages of laborers, mechanics and clerks, *in the hands of those by whom such laborers may be employed . . . .*" 1869 Neb. Laws 170. While Nebraska's wage garnishment statute was modified several

11

times thereafter, the language, "*wages . . . in the hands of those by whom such laborers may be employed,*" remained unchanged.  *See* 1873 Neb. Laws 715; 1907 Neb. Laws 494; 1969 Neb. Laws 779.

In 1968, Congress passed the Consumer Credit Protection Act (CCPA).  Pub. L. No. 90-321, 82 Stat. 146 (1968).  It did so, in part, in response to a rising tide of consumer bankruptcy filings.  H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1963.  The CCPA essentially did two things.  *First*, it required lenders to make extensive new disclosures regarding the terms and conditions of consumer credit lending.  *Second*, in response to the perception of advocates for consumers that abusive garnishments were unnecessarily driving many debtors into bankruptcy, the CCPA restricted the amount of wages of any debtor that could be garnished.  H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1963.  The goal was to allow consumer credit lending to continue at its rapid pace, while requiring full disclosure to debtors of the costs and consequences of financing purchases.  The hope was also that restricting perceived abusive garnishment practices would cut down on the number of bankruptcy filings.  H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1966.

Under the CCPA, in general, a creditor is prohibited from garnishing more than (a) 25% of a wage-earner's disposable earnings "for any workweek" or (b) the amount by which such disposable earnings for that "workweek" exceed 30 times the federal minimum hourly wage, whichever is less. 15 U.S.C. § 1673(a) (1994).  The statute defines "earnings" as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program." *Id.* § 1672(a).  "Disposable earnings" is also a defined term meaning "that part of the earnings of any individual remaining after the deduction from the earnings of any amounts required by law to be withheld."  *Id*. § 1672(b).[3]  The CCPA set a federal ceiling with respect to the percentage of a wage-earner's disposable earnings that could be garnished.  *Id*. § 1673.  States were free to pass even more restrictive limitations on garnishments, or to abolish wage garnishment entirely, but they could not provide more

_____

[3] Garnishment, as defined, is broad enough to cover collection attempts by a bankruptcy trustee.  15 U.S.C. § 1672(c).

12

expansive wage garnishment rights to creditors. *Id.* § 1677. The CCPA's effective date was July 1, 1970, designed to give state legislatures time to bring their own garnishment laws into line with the act.

The CCPA has a bountiful legislative history that demonstrates clearly that its garnishment provisions were designed to protect the earnings of wage-earners who earned their compensation engaged in a traditional employer-employee relationship. For example, Title II of the Act was described in the House Report as "restrict[ing] the garnishment of *wages*, which the committee finds to be a frequent element in the predatory extension of credit, resulting, in turn, in a disruption of *employment*, production, and consumption." H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1963 (emphasis added). Further, the Report noted, "Title II of your committee's bill, restricting the garnishment of *wages*, will relieve many consumers from the greatest single pressure, forcing *wage earners* into bankruptcies." H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1963 (emphasis added). Likewise, later in the Report it is stated: "The limitations on garnishments of *wages* as adopted by your Committee, . . . will relieve countless honest debtors driven by economic desperation from plunging into bankruptcy in order to preserve their *employment* and insure a continued means of support for themselves and their families." H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1979 (emphasis added). Indeed, the House Report quoted at length from a 1967 speech given by President Johnson in which he said: "Hundreds of workers among the poor lose their *jobs* or most of their *wages* each year as a result of garnishment proceedings;" emphasized the need for "a comprehensive study of the problems of *wage garnishment*;" and stated, "I am directing the Attorney General . . . to recommend the steps that should be taken to protect the hard-earned *wages* and the *jobs* of those who need the income most." *See* H.R. REP. NO. 90-1040, *reprinted in* 1968 U.S.C.C.A.N. 1962, 1966 (emphasis added). And, when the statute was passed it contained the following congressional findings and declaration of purpose:

(a)     The Congress finds:
(1)     The unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit. Such extensions of credit divert money into excessive credit payments and thereby hinder the production and flow of goods in interstate commerce.

13

(2)  The application of garnishment as a creditor's remedy frequently results *in loss of employment* by the debtor, and the resulting disruption of *employment*, production, and consumption constitutes a substantial burden on interstate commerce.

(3)  The great disparities among the laws of the several States relating to garnishment have, in effect, destroyed the uniformity of the bankruptcy laws and frustrated the purposes thereof in many areas of the country.

(b)  On the basis of the findings stated in subsection (a) of this section, the Congress determines that the provisions of this subchapter are necessary and proper for the purpose of carrying into execution the powers of the Congress to regulate commerce and to establish uniform bankruptcy laws.

15 U.S.C. § 1671 (emphasis added).

In 1972, the Nebraska Unicameral Legislature (Unicameral) adopted virtually verbatim the language contained in Sections 1672 and 1673 of the CCPA as Nebraska's new wage garnishment statute.  Act of March 30, 1972, 1972 Neb. Laws 333.[4]  The

---

[4] The Nebraska statute, in its entirety, provides:

> (1) Except as provided in subsection (2) of this section, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment shall not exceed the lesser of the following amounts:
>> (a) Twenty-five percent of his disposable earnings for that week;
>> (b) The amount by which his disposable earnings for that week exceed thirty times the federal minimum hourly wage prescribed by 29 U.S.C. 206(a)(1) in effect at the time earnings are payable; or
>> (c) Fifteen percent of his disposable earnings for that week, if the individual is a head of a family.
> (2) The restrictions of subsection (1) of this section shall not apply in the case of:
>> (a) Any order of any court for the support of any persons;
>> (b) Any order of any court of bankruptcy under Chapter XIII of the Bankruptcy Act; or
>> (c) Any debt due for any state or federal tax.
> (3) No court shall make, execute, or enforce any order or process in violation of this section.  The exemptions allowed in this section shall be granted to any person so entitled without any further proceedings.

14

(4) For the purposes of this section:

    (a) Earnings shall mean compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program;

    (b) Disposable earnings shall mean that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld;

    (c) Garnishment shall mean any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt; and

    (d) Head of a family shall mean an individual who actually supports and maintains one or more individuals who are closely connected with him by blood relationship, relationship by marriage, by adoption, or by guardianship, and whose right to exercise family control and provide for the dependent individuals is based upon some moral or legal obligation.

(5) Every assignment, sale, transfer, pledge, or mortgage of the wages or salary of an individual which is exempted by this section, to the extent of the exemption provided by this section, shall be void and unenforceable by any process of law.

(6) No employer shall discharge any employee by reason of the fact that his earnings have been subjected to garnishment for any one indebtedness.

(7) In the case of earnings for any pay period other than a week, the Commissioner of Labor shall by regulation prescribe a multiple of the federal minimum hourly wage equivalent in effect to that set forth in this section.

Neb. Rev. Stat. § 25-1558. Such language is nearly identical to the CCPA, which provides:

§1672. Definitions

For purposes of the subchapter:

(a) The term "earnings" means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.

(b) The term "disposable earnings" means that part of the earnings of any

individual remaining after the deduction from those earnings of any amounts required by law to be withheld.

(c) The term "garnishment" means any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt.

§ 1673. Restrictions on garnishment

(a) Maximum allowable garnishment
Except as provided in subsection (b) of this section and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed

    (1) 25 per centum of his disposable earnings for that week, or
    (2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable,

whichever is less. In the case of earnings for any pay period other than a week, the Secretary of Labor shall by regulation prescribe a multiple of the Federal minimum hourly wage equivalent in effect to that set forth in paragraph (2).

(b) Exceptions
    (1) The restrictions of subsection(a) of this section do not apply in the case of
        (A) any order for the support of any person issued by a court of competent jurisdiction or in accordance with an administrative procedure, which is established by State law, which affords substantial due process, and which is subject to judicial review.
        (B) any order of any court of the United States having jurisdiction over cases under chapter 13 of Title 11.
        (C) any debt due for any State or Federal tax.
    (2) The maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment to enforce any order for the support of any person shall not exceed –
        (A) where such individual is supporting his spouse or dependent child (other than a spouse or child with respect to whose support such order is used), 50 per centum of such

16

Nebraska lawmakers did make *one* significant change to the federal language. Consistent with Nebraska's history of protection for families with dependents, the Unicameral restricted to 15% the amount of disposable income of a head of household that could be garnished. Richard F. Duncan, *Through the Trap Door Darkly; Nebraska Exemption Policy and the Bankruptcy Reform Act of 1978*, 60 NEB. L. REV. 219, 271 (1981). While, therefore, the language of Nebraska's wage exemption statute changed significantly so as to mirror the language of the CCPA, the linguistic change did not signal a change in viewpoint, but, rather, compliance with congressional mandate. Neither the language of the statute nor its legislative history gives any hint that the Unicameral intended to depart from its past pattern of protecting only wage-earners in traditional employer-employee settings or that it was not aware of, or that it disagreed with, the backdrop of the congressional legislative history demonstrating an intent to protect the *wages, or similar compensation,* of *wage-earners*. Likewise, scholarly commentaries on the new Nebraska legislation did not conclude that a major change in the coverage of the garnishment statute had occurred. Rather they noted that, generally, the Unicameral had modified Nebraska's wage garnishment statute to conform Nebraska law to the strictures of the CCPA; to protect wage-earners from excessive wage garnishment; and, by insertion of § 25-1558 (1)(c), to especially protect the wages of a head of a family. Duncan, *supra*, at 270-74.

---

individual's disposable earnings for that week; and
(B) where such individual is not supporting such a spouse or dependent child described in clause (A), 60 per centum of such individual's disposable earnings for that week;
except that, with respect to the disposable earnings of any individual for any workweek, the 50 per centum specified in clause (A) shall be deemed to be 55 per centum and the 60 per centum specified in clause (B) shall be deemed to be 65 per centum, if and to the extent that such earnings are subject to garnishment to enforce a support order with respect to a period which is prior to the twelve-week period which ends with the beginning of such workweek.
(c) Execution or enforcement of garnishment order or process prohibited
No court of the United States or any State, and no State (or officer or agency thereof), may make, execute, or enforce any order or process in violation of this section.

15 U.S.C. §§ 1672-1673.

B.      THE CASE LAW

        1.      Kokoszka

        In 1974, four years after the CCPA became effective and only two years after the Unicameral enacted § 25-1558, the United States Supreme Court for the first time interpreted Sections 1672 and 1673 of the CCPA.  *Kokoszka v. Belford*, 417 U.S. 642 (1974).  In *Kokoszka*, the issue was whether a debtor's tax refund was property of the bankruptcy estate and, if so, whether the debtor could exempt seventy-five percent of his refund under the CCPA.  The Court ruled that the lump sum payment in the form of a tax refund was property of the estate and, further, that the CCPA did not apply.  On the second point, the Court adopted the reasoning of the Second Circuit, which had held that Sections 1672 and 1673 of the CCPA do not apply to protect all forms of compensation derived from personal services nor to all assets derived from such compensation:[5]

        The Court of Appeals held that the terms "earnings" and "disposable earnings," as used in 15 U.S.C. §§ 1672, 1673, did not include a tax refund, but were limited to "periodic payments of compensation and [do] not pertain to every asset that is traceable in some way to such compensation." This view is fully supported by the legislative history. *There is every indication that Congress, in an effort to avoid the necessity of bankruptcy, sought to regulate garnishment in its usual sense as a levy on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis.* There is no indication however, that Congress intended drastically to alter the delicate balance of a debtor's protections and obligations during the bankruptcy procedure. We therefore agree with the Court of Appeals that the Consumer Credit Protection Act does not restrict the right of the trustee to treat the income tax refund as property of the bankrupt's estate.

417 U.S. at 651-52 (emphasis added) (citation omitted).

_____

        [5] Actually, the court also adopted that portion of the 8th Circuit's earlier decision in *Gehrig v. Shreves* (*In re Gehrig*), 491 F.2d 668 (8th Cir. 1974), wherein the circuit court adopted the reasoning of the 2nd Circuit in *Kokoszka*.  In *Gehrig*, the 8th Circuit had agreed that the intent of the CCPA was to protect periodic payments of compensation to honest debtors who were also wage-earners and not to protect every asset traceable in some way to such compensation.  *Id*. at 673-74.

Of further note, the Second Circuit had explicitly rejected, and the Supreme Court implicitly rejected, the very argument made by Appellant in this appeal; i.e., that funds (accounts receivable from a business or a tax refund) are "earnings" whenever they have their source in personal services and that when collected they are *all* disposable because nothing is required by law to be withheld. *In re Kokoszka*, 479 F.2d 990, 996-97 (2d Cir. 1973); *see Kokoszka*, 417 U.S. at 649. Moreover, the Supreme Court implied, without clearly deciding, that the CCPA was not a federal exemption law within the meaning of Section 6 of the Bankruptcy Act. *See Kokoszka*, 417 U.S. at 650-51; *see also In re Brissette*, 561 F.2d 779, 784-85 (9th Cir. 1977)("The draftsmen of the CCPA were concerned only with the problem of imposing uniform limitations on wage garnishment and did not intend to create a federal bankruptcy exemption.") Accordingly, following *Kokoszka,* any argument that the CCPA provides a federal exemption under § 522(b)(2)(A) of the Bankruptcy Code is foreclosed. As a result of the *Kokoszka* decision, the issue in bankruptcy proceedings is solely whether a state wage-garnishment protection statute, such as Nebraska's § 25-1558, constitutes a state exemption law for purposes of incorporation in bankruptcy under § 522(b)(2)(A) of the Bankruptcy Code.[6] Most cases, including Nebraska authority, addressing this issue have held that state wage garnishment statutes do provide a state law exemption. *See, e.g., In re Maidman,* 141 B.R. 571, 572-73 (Bankr. S.D.N.Y. 1992); *In re Sanders*, 69 B.R. 569, 576 (Bankr. E.D. Mo. 1987); *In re Stewart*, 32 B.R. 132, 137 (Bankr. D. Utah 1983); *In re Smith*, 23 B.R. 708, 709 (Bankr. D. Md. 1982); *Live Stock Nat'l Bank v. Jackson*, 288 N.W. 515, 517 (Neb. 1939). *But see In re Lawrence*, 205 B.R. 115, 118-19 (Bankr. E.D. Tenn. 1997)(a state statute patterned after §§ 1672 and 1673 of the CCPA is not a state exemption statute, but rather only regulates the process of one form of execution, garnishment of earnings in

---

[6] Section 522(b)(2)(A) exempts

> any property that is exempt under Federal law . . . or State or local law that is applicable on the date of filing of the petition at the place in which the debtor's domicile has been located for 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180 day period than in any other place . . . .

11 U.S.C. § 522(b)(2)(A).

the hands of a third party), *aff'd*, 219 B.R. 786 (E.D. Tenn. 1998); *In re Siegel*, 214 B.R. 329, 331 (Bankr. W.D. Tenn. 1997).

2. *The Case Law Following* Kokoszka[7]

There is no Nebraska case on point, of course, or we three bankruptcy appellate panel judges would not be spending our time debating whether § 25-1558 protects persons other than typical wage-earners. However, the CCPA and its mirror state statutes are much litigated and a fair body of case law has developed around them. One question addressed by many of the cases is whether the legislation protects from garnishment compensation of persons working in non-traditional work settings, such as professionals, entrepreneurs, and independent contractors. A second question addressed by many such cases is whether, even in the employer-employee setting, an employee's non-periodic compensatory payments may be protected. A third question often litigated is whether sums can be protected once they are paid to the debtor. All three lines of cases have importance for this decision.

a. Wage-earners Only

Most cases that have addressed this question have limited protection to wage-earners only.

For example, in *Olson v. Townsend*, 530 A.2d 566 (Vt. 1987), the Vermont Supreme Court interpreted language identical to Nebraska's and rejected a self-employed surveyor's argument that a receivable for services rendered fell within the definition of earnings:

> Defendant . . . does not focus on the statutory definition of 'earnings,' which definition is incorporated in the definition of 'disposable earnings.' In [the Vermont statute] 'earnings' is defined as either 'wages, salary, commission, bonus, or otherwise,' all words which are commonly understood to apply within an employer-employee relationship. By longstanding rules of

---

[7] Appellant and appellees have cited innumerable cases that are not here considered or discussed. For the most part, these cases deal with statutory language that is materially distinct from that under consideration here.

construction, the words 'or otherwise' include other forms of compensation similar in nature to those enumerated.

*Id.* at 567 (citations omitted).

In *In re Welty*, 217 B.R. 907, 910-11 (Bankr. D. Wy. 1998), a bankruptcy court again construed the precise language of § 1673 of the CCPA as not extending to the accounts receivable of a Chapter 13 debtor engaged in an unincorporated business. The factual setting, therefore, was identical to that involved here. The court noted that the Wyoming Supreme Court had previously held, in *Coones v. Federal Deposit Insurance Corp.*, 796 P.2d 803, 805 (Wy. 1990), that the words "or otherwise" in its own state mirror statute did not operate to extend the exemption beyond conventionally described earnings for personal services and that profits and business earnings are outside the meaning of wages and salary. The bankruptcy court, construing § 1673 of the CCPA, agreed:

> Both federal and state law provide that the maximum portion of "the aggregate disposable earnings of an individual" for an applicable work week is exempt up to a specified percentage. Earnings are defined as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise." 15 U.S.C. § 1672; Wyo. Stat. § 1-15- 102 (1997).
> Mr. Welty's exemption fails because the accounts receivable of his business are not "disposable earnings" as defined by 15 U.S.C. § 1672. The United States Supreme Court interpreted the term "disposable earnings" for purposes of the CCPA in the case of *Kokoszka v. Belford*. The Court essentially equated disposable earnings with "periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis." *Id.* at 651, 94 S.Ct. at 2436.
> * * *
> In light of the statutory interpretations of the two high courts and the commonality of the language, Mr. Welty's business accounts receivable are not exempt from this chapter 13 estate as disposable earnings. Only personal compensation earned and due on the date he filed his petition, if any, is exempt from the estate and from the liquidation analysis required under § 1325(a)(4).

*Welty*, 217 B.R. at 910-11.

Numerous cases construing the CCPA or state statutes that mirror it are in accord. *See, e.g.*, *Coward v. Smith*, 636 P.2d 793, 796 (Kan. Ct. App. 1981) (payments due independent roofing contractor for approximately two weeks of roofing work done by him and several employees are not earnings; "That the protection offered by Congress was primarily for the wage earner in an employer-employee relationship is seen from the expressions of congressional intent . . . and the statutory provisions when read in pari materia. Compensation to an employee is by its very nature for personal services rendered for the employer's benefit. On the other hand, an independent contractor generally employs others to perform the labor and his compensation includes more than compensation for personal services." (citations omitted)); *In re Price*, 195 B.R. 775, 777-78 (Bankr. D. Kan. 1996) (following *Coward,* but finding a real estate agent's relationship with broker to be one of employer-employee and allowing exemption for commissions that are due); *Gerry Elson Agency, Inc. v. Muck*, 509 S.W.2d. 750, 755 (Mo. Ct. App. 1974)(independent trucker whose lessor exercised no control over the details of his work and paid him a percentage, without deductions, of the revenue derived from shipments was not engaged in traditional employer-employee relationship and therefore was not covered by the garnishment limitation; "He did not come within the descriptive ambit of a wage earner whose income and thus his employment (and the welfare of his family) would be jeopardized by burdensome garnishments or bankruptcy. Neither did his 'compensation' depend upon 'personal services' as used in the statute."); *Friedt v. Moseanko*, 498 N.W.2d 129, 133-34 (N.D. 1993) (holding that proceeds from milk were not "earnings" as defined by N.D. Cent. Code § 32-09.1-03 and 15 U.S.C. § 1673; "So defined, the term "earnings" does not have the broad dictionary meaning that includes "business profits.") (citing numerous cases in support).

The three cases cited by the majority, *In re Duncan*, 140 B.R. 210 (Bankr. E.D. Tenn. 1992); *In re Sexton*, 140 B.R. 742 (Bankr. S.D. Iowa 1992); and *Marian Health Center v. Cooks*, 451 N.W.2d 846 (Iowa Ct. App. 1989), are either distinguishable or badly reasoned. In *Cooks*, a bank agreed to pay Cooks $25 per week to shine shoes in the bank during certain hours of a given day. Cooks was not to be paid by his customers. Based, not on "plain meaning," but on the court's view that garnishing income of an independent contractor would be as likely to result in bankruptcy as garnishing wages of an employee, the court held that Cooks' payments from the bank were protected. *Cooks,* 451 N.W.2d at 847-48. Cooks was not trying to protect accounts receivable due from a customer. Moreover, the opinion

22

nowhere is so bold as to suggest that the statutory language clearly dictates the result. *Sexton*, decided by an Iowa bankruptcy court three years later, merely followed *Cooks*. *Sexton*, 140 B.R. at 743-44. *Duncan* involved post-petition commissions earned by an insurance agent that the court found to be exempt under Tennessee law. Relying on *Cooks* and on *MDFC Equipment Leasing Corp. v. Glickman* (*In re Glickman*), 126 B.R. 124 (Bankr. M.D. Fla. 1991), the court held that the statute applies to independent contractors as well as wage-earners. *Duncan*, 140 B.R. at 213-14. As previously noted, however, *Cooks* was a policy decision and, I believe, shallowly analyzed; and, *Glickman* was decided under a differently worded statute and has since been effectively overruled. *See Schlien v. Mills* (*In re Schlien*), 8 F.3d 745, 755 (11th Cir. 1993)(Florida statute, which protects "payment of any money . . . due to any person who is the head of a family . . . when the money or other thing is due for the personal labor or services of such person," does not protect payments due independent contractors); *see also In re Branscum*, 229 B.R. 32, 33-34 (Bankr. M.D. Fla. 1999)(Florida statute which protects "earnings" defined as "compensation paid or payable . . . for personal services or labor, whether denominated as wages, salary, commissions, or bonus," only protects wage-earners, not entrepreneurs or independent contractors; citing numerous Florida cases in support).[8]

      b.     Periodic Payments Only

The language has been further restricted. *Even if* earnings are generated in an employer-employee setting, the statutory language has been held to cover only regular, periodic payments and not lump-sum payments.

A case on point is *Pallante v. International Venture Investments Ltd.*, 622 F. Supp. 667 (N.D. Ohio 1985), in which an employee sought to exempt, under § 1673(a) of the CCPA, nearly $50,000 owed to him by his former employer as severance pay. Relying on *Kokoszka*, the court denied the exemption. "The determinative factor in deciding whether severance pay is subject to the statutory limitations is whether the monies are received in

---

[8] The *Lawrence* case, 205 B.R. at 124, refused to follow *Duncan*, but having determined that the Tennessee statute did not provide an exemption at all, it never had to reach the issue of whether a professional's accounts receivable were exempt.

periodic payments. . . . It is when payments are periodic that severance pay is intended to provide income similar to current earnings." *Id*. at 669 (citing *In re Phillips*, 45 B.R. 529, 532 (Bankr. N.D. Ohio 1984))*; In re Talbert*, 15 B.R. 536 (Bankr. W.D. La. 1981); *see also Kokoszka v. Belford*, 417 U.S. 642, 651 (1974); *Fisher Body v. Lincoln Nat'l Bank & Trust Co.*, 563 N.E.2d 149, 151 (Ind. Ct. App. 1990).

c.     Payments in The Hands of Third Parties

Finally the courts hold that once the debtor has obtained control over earnings, garnishment protection is not available because there is no longer a need to protect the employer-employee relationship.

For example, the issue in *John O. Melby & Co. Bank v. Anderson*, 276 N.W.2d 274 (Wis. 1979), was whether the garnishment restrictions of the CCPA applied to wages deposited in a checking account. The court held that they were not so protected, noting that it had been convincingly demonstrated that the intent of the CCPA garnishment provisions "was to protect the employment relationship" and that the statute was aimed at "the evils that befall the relationship when wages are garnished." *Id.* at 276. "It could not be clearer that the Congress was concerned with the protection of earnings in the ordinary payroll process." *Id.* at 277.

Similarly in *Dunlop v. First Nat'l Bank*, 399 F. Supp. 855 (D. Ariz. 1975), the federal district court read the CCPA the same way, concluding that Sections 1672 and 1673 of the CCPA are targeted at protecting the employer-employee relationship and that once wages are paid there is no longer a need to try to save the debtor's job. *See also*, *e.g.*, *Usery v. First Nat'l Bank*, 586 F.2d 107 (9th Cir. 1978); *In re Lawrence*, 205 B.R. 115, 118-22 (Bankr. E.D. Tenn. 1997) (gathering cases), *aff'd*, 219 B.R. 786 (E.D. Tenn. 1998); *Frazer, Ryan, Goldberg, Keyt & Lawless v. Smith*, 907 P.2d 1384, 1388 (Ariz. Ct. App. 1995); *Edwards v. Henry*, 293 N.W.2d 756, 757-58 (Mich. Ct. App. 1980); *Caulley v. Caulley*, 777 S.W.2d 147, 150-51 (Tex. App. 1989)(noting that the CCPA does not protect earnings once they have come into possession of the debtor), *aff'd in part and rev'd in part,* 806 S.W. 2d 795 (1991). *But see*, *e.g.*, *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078, 1086-87 (10th Cir. 1994); *Morrison v. Kobernusz* (*In re Kobernusz*), 160 B.R. 844, 847-48

(D. Colo. 1993) (finding wages placed in a bank account to be exempt, relying on *Rutter v. Shumway*, 26 P. 321 (Colo. 1891)); *MidAmerica Sav. Bank v. Miehe*, 438 N.W.2d 837, 839-40 (Iowa 1989).

        d.      Lessons Learned From The Case Law

I derive from these cases the conclusion that this is not a simple "split of authority." Generally, this statutory language has been construed in a way so as to protect only employees and then only those who receive periodic payments. It was passed to protect the employer-employee relationships, not to save a professional's accounts receivable. In short, there is very little case law to support the majority's position.

C.      THE LANGUAGE

Ah yes, my colleagues say, that may all be true, but it is of so little consequence that we barely need mention it. Rather, they say, today we live in an era of "plain meaning." *See, e.g., United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989).

I thoroughly agree, of course, that we must begin with the language the Unicameral used. If, after parsing the language, its meaning appears plain, we ignore history and, it seems, a Supreme Court decision. The problem with parsing, and with its sibling "plain meaning," however, is that what is plain to one may not be plain to another. It is not at all plain to me that, as the majority states, fees generated by an attorney fall "squarely" within the statutory definition for "earnings" in Neb. Rev. Stat. § 25-1558. I am particularly troubled by the suggestion that the language of Paragraph 4(a) is clear and unambiguous. I reject the majority's view that its construction of § 25-1558 is a plain meaning reading. Rather, as the majority seems to admit in the end, it has chosen one of two possible constructions of an ambiguous statute based on its view that it is fair and logical to treat equally all people who actively, rather than passively, earn money.

        1.    *A Holistic View of § 25-1558*

Subdivision 4(a) of § 25-1558 defines earnings as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement plan." The majority cannot and does not assert that Appellant's business income, in the form of accounts receivable, is wages, salary, commission, bonus, pension, or retirement pay. Rather, the majority asserts that the accounts receivable of a professional are "compensation paid or payable for personal services" falling within the "or otherwise" category. The majority offers three basic reasons why its reading of "earnings" is plainly correct. I find each of those arguments wanting.

a.       The Unicameral Could Have Used Limiting Language

*First*, the majority argues, Appellant's accounts receivable, at least to the extent derived from her personal activities, are in payment for her personal services. Had the Unicameral wished it could have limited coverage by adding limiting language making clear that such compensation need be earned in an employment setting. To support these arguments, the majority points to Subsection 5 of § 25-1558 which prevents the pledge or assignment of "wages or salary" rather than the broader term earnings.

I think the counterview more applicable. The Unicameral *did* add language limiting construction of the words "compensation . . . for personal services," when it followed these words with examples, all of which, in their normal parlance, apply only in a typical employer-employee setting. Had the Unicameral wanted to expand protection to non-traditional settings it could have added language to make that intention clear, as some states have done.[9]

Statutory construction, after all, is a "holistic endeavor" in which words cannot be read in isolation. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484

---

[9] *See Bargas v. Nye* (*In re Nye*), 210 B.R. 857, 859 (D. Colo. 1997)(interpreting Colo. Rev. Stat. § 13-54-104, which specifically defines earnings to include payments received by an independent contractor); *see also Morrison v. Kobernusz (In re Kobernusz)*, 160 B.R. 844, 847 (D. Colo. 1993).

26

U.S. 365, 371 (1988). Under the maxim of *expressio unius est exclusio alterius*, "compensation . . . for personal services" is to be read with and confined by the examples which follow. Wages, salaries, commissions, bonuses, and pensions or retirement benefits are, in ordinary parlance, compensation for personal services paid by employers to employees. These examples place flesh on the earlier words. Similarly, "or otherwise" should be read and confined to the examples given and those of similar ilk. The maxim of *ejusdem generis* dictates that "a general term following a list of particulars be interpreted as a reference to subjects akin to those specifically enumerated." *Preferred Risk Mutual Ins. Co. v. United States*, 86 F.3d 789, 794 (8th Cir. 1996) (citing *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)); *see also First Trust Co. v. Davis* (*In re Grainger's Estate*), 38 N.W.2d 435, 438 (Neb. 1949); *State v. Bone Creek Township*, 190 N.W. 586, 588 (Neb. 1922). Thus, a proper reading, when read in context, is that the language protects the types of personal compensation it enumerates and similar compensation, not forms of personal compensation that are clearly distinguishable.

Nor is there significance in the fact that the Unicameral used the words "wages or salary" rather than "earnings" in Paragraph 5. In fact, when viewed in light of its origins, the reverse is true. Section 1673 of the CCPA did not contain a provision preventing assignment or pledge of wages and the like. The Unicameral added the protections in Paragraph 5 to make clear that what was protected from garnishment also could not be assigned. The use of the words "wages or salary" signaled an intention, I believe, to protect against assignment or pledge anything that was also preserved from garnishment, thus basically using the words wages and salary to generally describe the types of compensation covered by the entire section. To be noted, moreover, is the further fact that the majority's construction of this section hardly seems reasonable; no policy reason is apparent for preventing a debtor from assigning or pledging wages and salary, but not other forms of compensation set forth in Paragraph 4(a).

b.     Periodic Does Not Mean What It Says

Second, in what can only be fairly viewed as a strained reading of words, the majority dismisses the use of the words "workweek," "week," and "periodic" throughout the statute as not "particularly probative." After all, the majority urges, Paragraph 7 permits the

27

Commissioner of Labor to prescribe multiples for "pay periods" other than a week. Also, the majority urges, commissions and bonuses are sometimes paid in lump sums, not periodically, and *they* are covered. From this reasoning the majority stretches even further to find that because attorneys bill for discrete periods of time, their accounts receivable are usually paid, in some way, periodically.

I think the Unicameral meant what it said. Again, reading the statute as a whole, it intended to protect the regular periodic payments received by employees who are usually, but not always, paid on an weekly basis. Paragraph 7 merely recognizes that some employees are paid on a periodic basis that is not weekly, perhaps monthly or bi-weekly. Importantly, paragraph 7 uses the words "for a pay period," a phrase that, in any reasonable interpretation, refers to the periods of time usually experienced by employees and that has no application to accounts receivable. Finally, the majority's assumption that non-periodic lump sum payments of commission and bonuses would be covered has been not so obvious to a number of courts. *See* discussion Part B.2.b., *supra*. The majority's interpretation is far too strained to abide by the rule that words and phrases of a statute are to be "construed and understood according to the common . . usage of the language." Neb. Rev. Stat. § 49-802(5); *United States v. Fountain*, 83 F.3d 946, 952 (8th Cir. 1996); *State v. White*, 590 N.W.2d 863, 868-69 (Neb. 1999).

Further, the majority's interpretation leads to unfair and unintended results. The limitation on garnishment was intended to protect lowly wage-earners from excessive garnishment, which could lead to bankruptcy. These wage-earners can only protect 75% of each week's paycheck. In contrast, the majority's interpretation allows professionals, who may have a build-up of accounts receivable, to protect from garnishment a much larger amount owed longer than one week. Greater protection for a more privileged group could not have been the intent of the limitation on garnishment.

c.    Everything Is Disposable When It Comes To Professionals

Third, and finally, for professionals, entrepreneurs, and independent contractors, everything is disposable. This construction adds insult to the injury mentioned just previously. Not only does the majority's interpretation allow a professional such as

Appellant to exempt a larger amount of built-up earnings; but, because there is no withholding in such cases, it further favors more highly-paid workers.

This construction not only makes little sense, it also essentially writes Section 4(b) out of the statute, and we must, if possible, give effect to the entire language of a statute. *United States v. Days Inns of Am., Inc.*, 151 F.3d 822, 825 (8th Cir. 1998) (citing *Moskal v. United States*, 498 U.S. 103, 109-10 (1990)); *State v. Divis*, 589 N.W.2d 537, 541 (Neb. 1999). It is also a position directly rejected by the Second Circuit and indirectly rejected by the Supreme Court in the *Kokoszka* decisions. *In re Kokoszka*, 479 F.2d 990, 996-97 (2d Cir. 1973); *Kokoszka v. Belford*, 417 U.S. 642, 649 (1974).

However, the majority urges that to hold contrary to its decision "would reach the absurd result that, in the case of an attorney, the exemption would be available to a sole practitioner who works through his or her own professional corporation but would not be available to the sole practitioner who avoids the mechanics of incorporation." That, however, is not "absurd " at all. The benefits of incorporation and the disadvantages of not incorporating are many, as virtually anyone who looks to commencing business on one's own knows. There is nothing absurd about the result suggested. Protection from garnishment of wages owed by a corporation to its employed professional is just one small benefit of incorporation.

2.      *A Holistic View of Nebraska's Garnishment Statutory Scheme*

In general, courts construe statutes relating to the same subject matter together so as to maintain a consistent and sensible scheme. *Hatfield v. Bishop Clarkson Mem. Hosp.*, 679 F.2d 1258, 1262 (8th Cir. 1982); *State v. Brandy M.* (*In re Brandy M.*), 550 N.W.2d 17, 22 (Neb. 1996).

Other portions of the Nebraska garnishment scheme, when referring to § 25-1558, consistently refer to it as an exemption for wages of an employee. *See* Neb. Rev. Stat. § 25-1011 ("The notice to judgment debtor form shall include the following information . . . (b) That *wages* are exempt up to a certain level and the amount that can be garnished varies if the judgment debtor is the head of a family.") (emphasis added); Neb. Rev. Stat. § 25-1056

29

("Except when *wages* are involved, the garnishee shall hold the property of every description and the credits of the defendant in his or her possession or under his or her control at the time of the service of the summons and interrogatories until the further order of the court. . . . When *wages* are involved, the garnishee shall pay to the *employee* all disposable earnings exempted from garnishment by statute, and any disposable earnings remaining after such payment shall be retained by the garnishee until further order of the court.") (emphasis added); Neb. Rev. Stat. § 25-1552 ("Each natural person residing in this state shall have exempt from forced sale on execution the sum of two thousand five hundred dollars in personal property, except *wages*. The provisions of this section do not apply to the exemption of *wages*, that subject being fully provided for by section 25-1558.") (emphasis added). In pursuing our "holistic endeavor" of statutory interpretation, the Unicameral's use of only the terms "wages" and "employee" signals an intent that the garnishment limitation of § 25-1558 apply only to wages, or similar payments, in a traditional employer-employee relationship. The majority's construction would make complying with Neb. Rev. Stat. § 25-1056 particularly problematic for Appellant's account debtors if they received a garnishment summons; it would require them to realize that they owed the Appellant "wages" and that she was their "employee." This construction is far from the way that the ordinary and reasonable account debtor would view the relationship.

3.      *The Statutory Maxim:  Liberal Construction of Exemption Statutes*

It could be argued, as the majority does, that my interpretation does not give due deference to the maxim that exemption laws are to be construed liberally. *See, e.g., Wallerstedt v. Sosne* (*In re Wallerstedt*), 930 F.2d 630, 631 (8th Cir. 1991); *Murray v. Zuke*, 408 F.2d 483, 487 (8th Cir. 1969); *In re Welborne*, 63 B.R. 23, 26 (Bankr. D. Neb. 1986). This is true, although one might argue that, at times, its use appears little more than a makeweight relied upon to justify a conclusion that has already been reached. A close view of Nebraska's treatment of exemptions in general, however, weakens the strength of extensive reliance on the maxim. Nebraska is an opt-out state. Neb. Rev. Stat. § 25-15,105. Following passage of the Bankruptcy Code in 1978, the Unicameral, at the insistence of the credit lobby, replaced the liberal federal bankruptcy exemption scheme with the less generous state list of exemptions. Duncan, *supra,* at 234. At the same time, at the urging of consumer advocates, the Unicameral modestly increased the amount of Nebraska's then

extremely parsimonious homestead exemption and exemption in lieu of homestead, while still leaving it one of the smallest in the nation. *Id.* at 234; *see* William Houston Brown, *Political and Ethical Considerations of Exemption Limitations: The "Opt-Out" as Child of the First and Parent of the Second*, 71 AM. BANKR. L.J. 149, 218-19 (1997). It did not concurrently modify § 25-1558 to make absolutely clear that the section could apply to compensation for personal services earned in nontraditional settings. In fact, by using the language of §§ 1672 and 1673 of the CCPA, Nebraska lawmakers actually reduced from 85% to 75% the amount of disposable income a wage-earner could protect. Nor has Nebraska ever been viewed as a state with generous exemptions. *See* Brown, *supra*, at 218-19.

D.    CONCLUSION

Thus, while some might view Nebraska's parsimonious attitude towards exemptions as poor policy, we should not rewrite its laws. In short, I view the Appellant's argument, which the majority adopts, as a misguided attempt to fit a square peg into a round hole. While it might be good policy to grant Nebraska independent contractors, consultants, professionals, and entrepreneurs parity with Nebraska wage-earners, I do not believe that is what Nebraska lawmakers did. Because we engage in statutory construction, not in lawmaking, I would AFFIRM.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
EIGHTH CIRCUIT